WILLIAM A. WEINISCHKE
E-mail:  bill.weinischke@usdoj.gov
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-4592

Attorney for Plaintiff the United States of America

GRETCHEN L. ZMITROVICH
MS Bar No. 101470
Office of Pollution Control
Mississippi Department of Environmental Quality
P.O Box 2261
Jackson, Mississippi  39255
Telephone: (601) 961-5050
E-mail: gzmitrovich@mdeq.ms.gov

Attorney for Plaintiff the State of Mississippi



SOUTHERN DISTRICT OF MISSISSIPPI
FILED
APR 25 2019
ARTHUR JOHNSTON
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE STATE OF MISSISSIPPI <br><br> Plaintiffs, <br><br> v. <br><br> DENBURY ONSHORE, LLC., <br><br> Defendant. | CV- 3:19cv289HTWLRA <br><br> COMPLAINT FOR CIVIL PENALTIES AND INJUNCTIVE RELIEF UNDER THE CLEAN WATER ACT |

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Mississippi, acting at the request of the Mississippi Commission on Environmental Quality and the Mississippi Department of Environmental Quality (collectively, "MDEQ") file this Complaint and allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action for civil penalties and injunctive relief brought against Denbury Onshore, LLC ("Defendant" or "Denbury") under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq. and the Mississippi Air and Water Pollution Control Law ("MAWPCL"), Miss. Code Ann. § 49-17-1 et seq.

## JURISDICTION, AUTHORITY, VENUE, AND NOTICE

2.      This Court has jurisdiction over the subject matter of this action and over the parties pursuant to Sections 309(b) and 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E) and (n), and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over Mississippi's state law claims under the MAWPCL pursuant to 28 U.S.C. § 1367(a).

3.      Authority to bring this action on behalf of the United States is vested in the United States Department of Justice by Section 506 of the CWA, 33 U.S.C. § 1366, 28 U.S.C. §§ 516 and 519, and Section 10(a) of Executive Order No. 12,777, 56 Fed. Reg. 54,757(Oct. 22, 1991). Authority to bring this action on behalf of the State of Mississippi is vested in MDEQ in accordance with Miss. Code Ann. §§ 49-2-13, 49-2-21, 49-17-17 and 49-17-43 and the common law of Mississippi.

4.      Venue is proper in this District pursuant to Sections 309(b) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E) and 28 U.S.C. §§ 1391 and 1395(a), because Denbury does business in this District and some of the events giving rise to claims alleged herein occurred in this District.

5.     The United States has given notice of the commencement of this action to the States of Alabama and Mississippi, as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## DEFENDANT

6.     Defendant Denbury Onshore, LLC is a Delaware corporation with headquarters in Plano, Texas and is a wholly owned subsidiary of Denbury Resources, Inc., a publicly held corporation (hereinafter referred to as "Denbury" or "Defendant").   Defendant is registered to do business in Alabama and Mississippi.

## STATUTORY AND REGULATORY BACKGROUND
### Section 311(b)(3) of the Clean Water Act

7.     Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances *inter alia* into or upon the navigable waters of the United States or adjoining shorelines in such quantities as the President determines may be harmful to the public health or welfare or environment of the United States.

8.     The CWA defines "discharge" to include "any spilling, leaking, pumping, pouring, emitting, emptying or dumping," except as specifically excluded therein, 33 U.S.C. § 1321(a)(2); "oil" as "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil," 33 U.S.C. § 1321(a)(1); and "navigable waters" as "the waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7).

9.     Pursuant to Section 311(b)(4) of the CWA, 33 U.S.C. § 1321(b)(4), EPA, acting through its delegated authority under Executive Order No. 11,735, 38 Fed. Reg. 21,243 (Aug. 7, 1973), has determined by regulation that discharges of oil in such quantities as may be harmful to the public health or welfare or environment of the United States include discharges of oil that "(a) Violate

2

applicable water quality standards; or (b) Cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3.

10.     Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), provides that any person who is the owner, operator, or person in charge of an onshore facility from which oil is discharged in violation of Section 311(b)(3) of the CWA shall be subject to a civil penalty.

11.     Section 311(a) of the CWA defines "person" to include corporations, 33 U.S.C. § 1321(a)(7); and "onshore facility" as "any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land," 33 U.S.C. § 1321(a)(10).

12.     Pursuant to Section 311(b)(7)(A) of the CWA, EPA's 2004 Civil Monetary Penalty Inflation Adjustment Rule, 69 Fed. Reg. 7121 (Feb. 13, 2004), EPA's 2008 Civil Monetary Penalty Inflation Adjustment Rule, 73 Fed. Reg. 75,340 (Dec. 11, 2008) and EPA's 2013 Civil Monetary Penalty Inflation Adjustment Rule, 78 Fed. Reg. 66643 (Nov. 6, 2013) (EPA Penalty Inflation Adjustments), each violation of Section 311(b)(3) of the CWA occurring from March 15, 2004, through January 12, 2009, is subject to a civil penalty of up to $32,500 per day or up to $1,100 per barrel of oil discharged, each violation of Section 311(b)(3) of the CWA occurring after January 12, 2009 through December 6, 2013, is subject to a civil penalty of up to $37,500 per day or up to $1,100 per barrel of oil discharged, and each violation of Section 311(b)(3) after December 6, 2013 is subject to a civil penalty of up to $37,500 per day or up to $2,100 per barrel of oil discharged. 40 C.F.R. § 19.4.

13.     Pursuant to Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), and the EPA Penalty Inflation Adjustments, where the violation

of Section 311(b)(3) of the CWA is the result of gross negligence or willful misconduct, the owner, operator, and person in charge are subject to a civil penalty of up to $4,300 per barrel of oil discharged for violations occurring on or before December 6, 2013 and is subject to a civil penalty of up to $5,300 for violations occurring after December 6, 2013.

### Sections 301 and 309 of the Clean Water Act

14.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person, except as authorized by the CWA.

15.     Section 502 of the CWA defines "person" to include corporations, 33 U.S.C. § 1362(5); "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12); "pollutant" to include "solid waste, . . . chemical wastes, . . . biological materials, . . . and industrial . . . waste discharged into water," 33 U.S.C. § 1362(6); "navigable waters" as "the waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7); and "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged," 33 U.S.C. § 1362(14).

16.     Sections 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), authorize EPA to bring a civil action seeking "appropriate relief, including a permanent or temporary injunction," and civil penalties for violations of Section 301 of the CWA.

### Section 311(j) of the Clean Water Act and Oil Pollution Prevention Regulations

17.     Section 311(j)(1) of the CWA, 33 U.S.C. § 1321(j)(1), authorizes the President to issue regulations establishing procedures, methods, equipment, and other requirements to prevent and contain discharges of oil and hazardous substances from onshore facilities.

18.     Pursuant to Section 311(j)(1) of the CWA, EPA, acting through its delegated authority under Executive Order No. 11,735, 38 Fed. Reg. 21,243 (Aug. 7, 1973), and Executive Order No. 12,777, 56 Fed. Reg. 54,757 (Oct. 22, 1991), the President has issued Oil Pollution Prevention regulations governing owners and operators of non-transportation-related onshore and offshore facilities.  These regulations are found at 40 C.F.R. Part 112.

19.     The Oil Pollution Prevention regulations apply to "any owner or operator of a non-transportation-related onshore or offshore facility engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using, or consuming oil and oil products, which, due to its location, could reasonably be expected to discharge oil in quantities that may be harmful, as described in [40 C.F.R. § 110.3], into or upon the navigable waters of the United States or adjoining shorelines . . . that has oil in: (1) Any aboveground container; . . . or (3) Any container that is used for standby storage, for seasonal storage, or for temporary storage, or not otherwise 'permanently closed' as defined in [40 C.F.R.] § 112.2."  40 C.F.R. § 112.1(b).

20.     40 C.F.R. § 112.2 defines "onshore facility" as "any facility of any kind located in, on, or under any land within the United States, other than submerged lands."

21.     40 C.F.R. § 112.3 requires the owner or operator of a facility subject to Part 112 to prepare and implement a written Spill Prevention, Control, and Countermeasure Plan ("SPCC Plan") in accordance with 40 C.F.R. § 112.7 and any other applicable section of 40 C.F.R. Part 112.

22.     On July 17, 2002, EPA promulgated a final rule ("Revised Rule") amending the Oil Pollution Prevention regulations.  67 Fed. Reg. 47,042 (July 17, 2002).  The effective date of the Revised Rule was August 16, 2002.

23.     The owner or operator of a regulated facility in operation as of August 16, 2002, that had not prepared and implemented an SPCC Plan as of that

date was required to prepare and implement an SPCC Plan immediately that met the requirements of the Revised Rule. 40 C.F.R. § 112.3; 67 Fed. Reg. 47,042, 47,082.

24.     The owner or operator of a regulated facility in operation as of August 16, 2002, that had prepared and implemented a SPCC Plan as of that date was required (a) to maintain an SPCC Plan in accordance with the requirements of 40 C.F.R. Part 112 (2002); and (b) to amend the SPCC Plan to meet the requirements of the Revised Rule, and implement that amended SPCC Plan, no later than November 10, 2010 (for onshore facilities required to have and submit Facility Response Plans), or November 10, 2011 (for other onshore facilities). 40 C.F.R. § 112.3(a)(1); 67 Fed. Reg. 47,042, 47,082; 75 Fed. Reg. 63,093, 63,096 (Oct. 14, 2010).

25.     Pursuant to 40 C.F.R. § 112.20(a), the "owner or operator of any non-transportation-related onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging oil into or on the navigable waters or adjoining shorelines" must prepare and submit to EPA a Facility Response Plan (FRP) that satisfies the requirements set forth in Part 112.

26.     Pursuant to 40 C.F.R. § 112.20(f)(1), a facility "could reasonably be expected to cause substantial harm to the environment" within the meaning of 40 C.F.R. § 112.20(a) if, *inter alia*, the facility has a total oil storage capacity of at least one million gallons and the facility is located at a distance such that a discharge from the facility could cause injury to fish and wildlife and sensitive environments.

27.     Pursuant to 40 C.F.R. § 112.21, the owner or operator of any facility required to prepare an FRP under 40 C.F.R. §112.20 shall develop and implement a facility response training program and a drill/exercise program that satisfy the requirements set forth in Part 112.

28.     Pursuant to 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), and the EPA Penalty Inflation Adjustments, each violation of the Oil Pollution Prevention regulations occurring from March 15, 2004, through January 12, 2009, is subject to a civil penalty of up to $32,500 per day of violation, and each violation of the Oil Pollution Prevention regulations occurring after January 12, 2009, is subject to a civil penalty of up to $37,500 per day of violation. 40 C.F.R. § 19.4.

### The Mississippi Air and Water Pollution Control Law

29.     Miss. Code Ann. § 49-17-29(2) makes it unlawful "to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any waters of the state" without a valid permit, and Miss. Code Ann. § 49-17-43(1) provides that it is unlawful to violate any permit provision.

30.     The MAWPCL defines "person" to include corporations, Miss. Code Ann. § 49-17-5(3)(b); "pollution" as "contamination, or other alteration of the physical, chemical or biological properties, of any waters of the state . . . or discharge of any liquid, gaseous, solid, radioactive, or other substance . . . into any waters of the state," Miss. Code Ann. § 49-17-5(1)(a); and "waters of the state" as "all waters within the jurisdiction of this state," Miss. Code Ann. § 49-17-5(1)(f).

31.     The MAWPCL authorizes MDEQ to bring a civil action seeking appropriate relief, including a permanent or temporary injunction, for violations of the MAWPCL. Miss. Code Ann. § 49-17-43(2). The MAWPCL further provides that any person violating the MAWPCL, any rule or regulation in force pursuant to the MAWPCL, any written order of the commission in pursuance of the MAWPCL, or any condition or limitation of a permit is subject to a civil penalty of up to $25,000 per day per violation. Miss. Code Ann. § 49-17-43(1).

### GENERAL ALLEGATIONS

32.     The Defendant is a "person" within the meaning of Sections

311(a)(7) and 502(5) of the CWA, 33 U.S.C. §§ 1321(a)(7) and 1362(5), and
Miss. Code Ann. § 49-17-29(2).

    33.    At times relevant to this action, Defendant held oil field leases in
Alabama and Mississippi where it owned or operated onshore oil production
facilities, which include production wells, pipes, valves, equipment, etc.  The oil
production and other facilities relevant to the oil spill and FRP and SPCC
violations alleged in this action are located in the Citronele Oil Field, Citronelle,
Mobile County, Alabama; and the following oil fields in Mississippi: Eucutta Oil
Field, Wayne County; Gluckstadt Oil Field, Madison County; East and West
Heidelberg Oil Fields, Jasper and Jones Counties; Martinville Oil Field, Simpson
County; Quitman Oil Field, Clarke County; Soso Oil Field, Smith and Jones
Counties; Summerland Oil Field, Jasper and Jones Counties; Tinsley Oil Field,
Yazoo County; and West Mallalieu Oil Field, Lincoln County.

    34.    Each of the facilities identified in Paragraph 33 is an "onshore
facility" as defined in Section 311(a)(10) of the CWA.

    35.    Denbury's production wells pump fluid from the subsurface
reservoirs within each oil field.  This reservoir fluid, also known as production
fluid, contains crude oil, petroleum hydrocarbons, produced water and other
substances. Produced water typically contains water, crude oil, grease, dissolved
salts, organic compounds, and inorganic compounds.  Once lifted to the surface by
pumping, the production fluid flows through the well head and into a collection
line (also known as a flow line, gathering line, or production line) which
discharges the production fluid to an oil-water separator tank.

    36.    Production fluid, petroleum hydrocarbons, crude oil and produced
water are "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C.
§ 1321(a)(1), and 40 C.F.R. § 112.2.

    37.    Production fluid, petroleum hydrocarbons, crude oil and produced
water are "pollutants" within the meaning of Section 502(6) of the CWA, 33

U.S.C. § 1362(6) and "pollution" within the meaning of Miss.
Code Ann. § 49-17-5.

## FACTS GIVING RISE TO LIABILITY

### Citronelle Oil Field Spills, Mobile County, Alabama

*Puppy Creek Watershed*

38.    On or about January 24, 2010, at least 100 barrels of production fluid
discharged from a flow line, owned or operated by Defendant. The production
fluid entered Puppy Creek or adjoining shorelines in sufficient quantity to cause a
film, sheen, discoloration, sludge, emulsion or violation of water quality standards
(January 24, 2010 spill).  Puppy Creek is a perennial tributary of the Escatawpa
River.

39.    Upon information and belief, the purported cause of the January 24,
2010 spill was internal corrosion on a flow line.

40.    The flow line described in Paragraph 38 is a "point source" within
the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

41.    On or about November 29, 2010, at least 7 barrels of crude oil
discharged from a flow line owned or operated by Defendant.  The crude oil
entered Puppy Creek or adjoining shorelines in sufficient quantity to cause a film,
sheen, discoloration, sludge, emulsion or violation of water quality standards
(November 29, 2010 spill).

42.    Upon information and belief, the purported cause of the November
29, 2010 spill was external corrosion on a flow line.

43.    The flow line described in Paragraph 41 is a "point source" within
the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

44.    On or about July 7, 2010, production fluid and at least 1 barrel of
crude oil discharged from a fiberglass gathering line owned or operated by
Defendant.  The crude oil and production fluid entered an unnamed, perennial,
tributary of Puppy Creek (Puppy Creek Tributary) or adjoining shorelines in

sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (July 7, 2010 spill).

45. Upon information and belief, the purported cause of the July 7, 2010 spill was a broken fiberglass gathering line that was struck by a contracting company working for the City of Citronelle.

46. The fiberglass gathering line described in Paragraph 44 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

47. Puppy Creek Tributary flows into Puppy Creek, which flows into the Escatawpa River, which flows into Robertson Lake, which flows into Beardslee Lake, which flows into the Pascagoula River, which flows into Pascagoula Bay, a bay of the Gulf of Mexico.

48. Puppy Creek Tributary and Puppy Creek, are "navigable waters" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. 1321(b)(3) and 1362(7).

49. The July 7, 2010, January 24, 2010, and November 29, 2010, spills were not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

50. The July 7, 2010, January 24, 2010, and November 29, 2010, spills were each a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. § 1321(a)(1) and (2), and 1321(b)(3).

51. The July 7, 2010, January 24, 2010, and November 29, 2010, spills each entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

52. The July 7, 2010, January 24, 2010, and November 29, 2010, spills were each an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

*Cedar Creek Watershed*

53.    On or about October 17, 2008, at least 10 barrels of crude oil discharged from a power oil line owned or operated by Defendant. The crude oil entered an unnamed, perennial, tributary of Little Creek, in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (October 17, 2008 spill).

54.    Upon information and belief, the purported cause of the October 17, 2008 spill was failure of a union joint seal on a 1 ¼-inch power oil line.

55.    The power oil line described in Paragraph 53 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

56.    On or about October 16, 2009, at least 5 barrels of crude oil discharged from an oil line owned or operated by Defendant. The crude oil entered an unnamed, perennial, tributary of Little Creek or adjoining shorelines in a quantity sufficient to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (October 16, 2009 spill).

57.    Upon information and belief, the purported cause of the October 16, 2009 spill was internal corrosion on an oil line.

58.    The oil line described in Paragraph 56 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

59.    On or about August 31, 2010, at least 5 barrels of crude oil discharged from a well owned or operated by Defendant. The crude oil entered an unnamed, perennial, tributary of Little Creek or adjoining shorelines in a quantity sufficient to cause a film, sheen, sludge, emulsion or violation of water quality standards (August 31, 2010 spill).

60.    Upon information and belief, the purported cause of the August 31, 2010 spill was a faulty pressure gauge on the D-6-11 well head.

61.    The well described in Paragraph 59 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

62.    On or about February 15, 2009, at least 233 barrels of crude oil and production fluid discharged from a transfer line owned or operated by Defendant. The crude oil and production fluid entered an unnamed perennial  tributary of Citronelle Branch (Citronelle Branch Tributary) or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (February 15, 2009 spill).

63.    Upon Information and belief, the purported cause of the February 15, 2009 spill was third party damage that severed the transfer line.

64.    The transfer line described in Paragraph 62 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

65.    On or about November 11, 2013, at least 18 barrels of crude oil and production fluid discharged from a flow line owned or operated by Defendant. The crude oil and production fluid entered an unnamed, perennial, tributary to Cedar Creek (Cedar Creek Tributary) in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (November 11, 2013 spill).

66.    Upon information and belief, the purported cause of the November 11, 2013 spill was a rupture to the flow line caused by a third party operating a marsh buggy in the flow line right-of-way.

67.    The flow line described in Paragraph 65 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

68.    The unnamed tributaries of Little Creek described in Paragraphs 53, 56, and 59 flow into Little Creek, which flows into Cedar Creek.

69.    Citronelle Branch Tributary flows into Citronelle Branch, which flows into Cedar Creek.

70.    Cedar Creek Tributary flows into Cedar Creek.

71.    Cedar Creek flows into the Mobile River, which flows into Mobile Bay, a bay of the Gulf of Mexico.

72.    The unnamed tributaries of Little Creek described in Paragraphs 53, 56, and 59, Citronelle Branch Tributary, Cedar Creek Tributary, are "navigable waters" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

73.    The October 17, 2008, October 16, 2009, August 31, 2010, February 15, 2009, and November 11, 2013 spills were not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

74.    The October 17, 2008, October 16, 2009, August 31, 2010, February 15, 2009, and November 11, 2013 spills were each a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

75.    The October 17, 2008, October 16, 2009, August 31, 2010, February 15, 2009, and the November 11, 2013 spills each entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

76.    The October 17, 2008, October 16, 2009, August 31, 2010, February 15, 2009, and November 11, 2013 spills were each an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

*Beaver Pond Branch Watershed*

77.    On or about December 24, 2014, at least 3 barrels of crude oil discharged from a flow line owned or operated by Defendant. The crude oil entered Beaver Pond Branch wetlands or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (December 24, 2014 spill).  Beaver Pond Branch wetlands abut Beaver Pond Branch, a perennial tributary of Bennett Pond Branch.

78.    Upon information and belief, the purported cause of the December 24, 2014 spill was a flow line leak.

79.    The flow line described in Paragraph 77 is a "point source" within

the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

80.     Beaver Pond Branch flows into Bennett Creek, which flows into the Escatawpa River, which flows into Robertson Lake, which flows into Beardslee Lake, which flows into the Pascagoula River, which flows into Pascagoula Bay, a bay of the Gulf of Mexico.

81.     Beaver Pond Branch and its wetlands, are "navigable waters" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

82.     The December 24, 2014 spill was not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

83.     The December 24, 2014 spill was a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

84.     The December 24, 2014 spill entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

85.     The December 24, 2014 spill was an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

The Eucutta Oil Field Spills, Wayne County, Mississippi

86.     On or about January 17, 2009, at least 10 barrels of crude oil discharged from a vent associated with a heater treater unit owned or operated by Defendant.  The crude oil entered an unnamed, perennial, tributary of Little Eucutta Creek or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (January 17, 2009 spill).

87.     Upon information and belief, the purported cause of the January 17, 2009 spill was a malfunction in the heater treater unit that caused oil to spill out through a vent.

88.    The vent and heater treater unit described in Paragraph 86 are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

89.    On or about January 16, 2010, at least 160 barrels of crude oil and production fluid discharged from a tank into a containment system owned or operated by Defendant.  The crude oil and production fluid breached the containment system and entered an unnamed, perennial, tributary of Little Eucutta Creek or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (January 16, 2010 spill).

90.    Upon information and belief, the purported cause of the January 16, 2010 spill was the failure of a transfer pump that caused a tank to overflow.

91.    The tank and containment system described in Paragraph 89 are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

92.    On or about December 29, 2009, at least 50 barrels of production fluid discharged from a fiberglass line owned or operated by Defendant.  The production fluid entered an unnamed, perennial, tributary of Wagon Branch (Wagon Branch Tributary) or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (December 29, 2009 spill).

93.    Upon information and belief, the purported cause of December 29, 2009 spill was deterioration of the external coating of a three-inch fiberglass line.

94.    The fiberglass line described in Paragraph 92 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

95.    The unnamed tributaries of Little Eucutta Creek described in Paragraphs 86 and 89 flow into Little Eucutta Creek.

96.    Wagon Branch Tributary flows into Wagon Branch, which flows into

Tampa Creek, which flows into Little Eucutta Creek.

97.    Little Eucutta Creek flows into Eucutta Creek, which flows into the Chickasawhay River, which merges with the Leaf River to form the Pascagoula River, which flows into Pascagoula Bay, a bay of the Gulf of Mexico.

98.    The unnamed tributaries of Little Eucutta Creek described in Paragraphs 86 and 89, and Wagon Branch Tributary are "navigable waters" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and are "waters of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

99.    The January 17, 2009, January 16, 2010, and December 29, 2009 spills were not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

100.   The January 17, 2009, January 16, 2010, and December 29, 2009 spills were each a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

101.   The January 17, 2009, January 16, 2010, and December 29, 2009 spills each entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

102.   The January 17, 2009, January 16, 2010, and December 29, 2009 spills were each an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1321(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

Gluckstadt Oil Field Spill, Madison County, Mississippi

103.   On or about November 15, 2009, at least 100 barrels of production fluid discharged from a carbon dioxide production facility owned or operated by Defendant. The production fluid entered an unnamed, perennial, tributary of Little

16

Bear Creek (Little Bear Creek Tributary) or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (November 15, 2009 spill).

104.   The purported cause of the November 15, 2009 spill is unknown.

105.   The production facility in Paragraph 103 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

106.   Little Bear Creek Tributary flows into Little Bear Creek, which flows into Bear Creek, which flows into the Big Black River, which flows into the Mississippi River, which flows into the Gulf of Mexico.

107.   Little Bear Creek Tributary is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and "water of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

108.   The November 15, 2009 spill was not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

109.   The November 15, 2009 spill was a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

110.   The November 15, 2009 discharge entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

111.   The November 15, 2009 discharge was an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

<u>East and West Heidelberg Oil Fields Spills, Jasper and Jones Counties,</u>

<u>Mississippi</u>

*Horse Branch Watershed*

112.    On or about August 8, 2008, at least 50 barrels of crude oil and production fluids discharged from an open bleeder valve on a flow line owned or operated by Defendant.  The crude oil and production fluids entered Horse Branch or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion or violation of water quality standards (August 8, 2008 spill).

113.    Upon information and belief, the purported cause of the August 8, 2008 spill was the operator bringing a well back online after opening a bleeder valve had been left open on a flow line.

114.    The bleeder valve and flow line described in Paragraph 112 are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

115.    On or about December 10, 2009, at least 10 barrels of crude oil discharged from a transfer pump, oil tank, and containment wall owned or operated by Defendant.  The crude oil entered Horse Branch or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (December 10, 2009 spill).

116.    Upon information and belief, the purported cause of the December 10, 2009 spill was the failure of a transfer pump that caused the oil tank to overflow with oil, which breached the containment wall and migrated off site.

117.    The transfer pump, oil tank, and containment wall described in Paragraph 115 are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

118.    Horse Branch is a perennial stream that flows into the Tallahatta Creek, which flows into Tallahala Creek, which flows into the Leaf River, which merges with the Chickasawhay River to form the Pascagoula River, which flows into the Pascagoula Bay, a bay of the Gulf of Mexico.

119.    Horse Branch is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and

"water of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

120.   The August 8, 2008 and December 10, 2009 spills were not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

121.   The August 8, 2008 and December 10, 2009 spills were each a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

122.   The August 8, 2008 and December 10, 2009 spills each entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

123.   The August 8, 2008 and December 10, 2009 spills were each an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

*Bogue Homa River Watershed*

124.   On or about March 10, 2011, production fluids and at least 5 barrels of crude oil discharged from a flow line, well head, and well owned or operated by Defendant.  The crude oil entered a portion of the Bogue Homa River upstream of Lake Bogue Homa or adjoining shorelines in a quantity sufficient to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (March 10, 2011 spill).

125.   Upon information and belief, the purported cause of the March 10, 2011 spill was heavy rains that lifted the flow line with the river water as it rose, causing the flow line to break a fitting that connects it to the well head.

126.   The flow line, well head, and well described in Paragraph 124 are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

127.   On or about February 14, 2013, at least 30 barrels of crude oil discharged from an open drain valve owned or operated by Defendant.  The oil entered Reedy Creek or adjoining shorelines in a quantity sufficient to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (February 14, 2013 spill).

128.   Upon information and belief, the purported cause of the February 14, 2013 spill was an oil leak that developed at a pump inside the facility, which allowed oil to flow to the open valve.

129.   The drain valve described in Paragraph 127 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

130.   Both Reedy Creek and the portion of the Bogue Homa River that the March 10, 2011 spill entered flow perennially into Lake Bogue Homa, which becomes the Bogue Homa River again before flowing into the Leaf River, which merges with the Chickasawhay River to form the Pascagoula River, which flows into the Pascagoula Bay, a bay of the Gulf of Mexico.

131.   Reedy Creek and the Bogue Homa River, are "navigable waters" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and are "waters of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

132.   The March 10, 2011 and February 14, 2013 spills were not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

133.   The March 10, 2011 and February 14, 2013 spills were each a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

134.   The March 10, 2011 and February 14, 2013 spills each entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40

C.F.R. § 110.3.

135.   The March 10, 2011 and February 14, 2013 spills were each an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1321(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

<u>Martinville Oil Field Spills, Simpson County, Mississippi</u>

136.   On or about January 30, 2009, at least 629.1 barrels of crude oil discharged from a well bore, blowout preventer, and production tube owned or operated by Defendant.  The crude oil entered the perennial portion of Crooked Creek or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (January 30, 2009 spill).  Crooked Creek is a tributary of the Strong River that flows at least seasonally and has perennial flow at this location.

137.   Upon information and belief, the purported cause of the January 30, 2009 spill was the failure of Defendant's contractor to set the blowout preventer to properly seal the well bore against the production tubing, possibly because the tubing was bent. When Defendant attempted to produce the well, the oil flowed out of the charged well bore between the blowout preventer seal and the production tubing.

138.   The well bore, blowout preventer, and production tube described in Paragraph 136 are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

139.   On or about March 30, 2013, at least 25 barrels of crude oil discharged from an open-ended pipe owned or operated by Defendant. The crude oil entered the perennial portion of Crooked Creek or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (March 30, 2013 spill).

140.   Upon information and belief, the purported cause of the March 30,

21

2013 spill was operator error that took place during a transfer of inhibitor oil from the inhibitor oil tank. The operator inadvertently opened the incorrect valve, which led to an open-ended pipe, which released oil outside of the secondary containment.

141.   The open-ended pipe described in Paragraph 139 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

142.   Crooked Creek flows into the Strong River, which merges with the Pearl River, which flows into Lake Borgne, an inlet in the Gulf of Mexico.

143.   Crooked Creek is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and "water of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

144.   The January 30, 2009 spill and the March 30, 2013 spill were not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

145.   The January 30, 2009 spill and the March 30, 2013 spill were discharges of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

146.   The January 30, 2009 spill and the March 30, 2013 spill each entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

147.   The January 30, 2009 spill and the March 30, 2013 spill were unlawful discharges of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

<u>Quitman Oil Field Spill, Clarke County, Mississippi</u>

148.   On or about May 26, 2010, production fluid and at least 5 barrels of oil discharged from a flow line owned or operated by Defendant. The production

fluid and oil entered Long Branch or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (May 26, 2010 spill).

149.   Upon information and belief, the purported cause of the May 26, 2010 spill was a three-inch fiberglass flow line rupture.

150.   The flow line described in Paragraph 148 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

151.   Long Branch is a perennial stream that flows into Tallabogue Creek, which flows into Buckatunna Creek, which flows into the Chickasawhay River, which merges with the Leaf River to form the Pascagoula River, which flows into Pascagoula Bay, a bay of the Gulf of Mexico.

152.   Long Branch is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and "water of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

153.   The May 26, 2010 spill was not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

154.   The May 26, 2010 spill was an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

155.   The May 26, 2010 spill was a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

156.   The May 26, 2010 spill entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

Soso Oil Field Spills, Smith and Jones Counties, Mississippi

157.   On or about March 2, 2009, at least 40 barrels of crude oil discharged

from an inhibitor oil line owned or operated by Defendant.  The crude oil entered Mill Creek or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (March 2, 2009 spill).

158.   Upon information and belief, the purported cause of the March 2, 2009 spill was the failure of an inhibitor oil line due to external corrosion.

159.   The inhibitor oil line described in Paragraph 157 are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

160.   On or about June 1, 2009, at least 25 barrels of crude oil discharged from an oil line owned or operated by Defendant.  The crude oil entered Mill Creek or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (June 1, 2009 spill).

161.   Upon information and belief, the purported cause of the June 1, 2009 spill was external corrosion on the oil line.

162.   The oil line described in Paragraph 160 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

163.   Mill Creek is a perennial stream that flows into Big Creek, which flows into the Leaf River, which merges with the Chickasawhay River to form the Pascagoula River, which flows into Pascagoula Bay, a bay of the Gulf of Mexico.

164.   Mill Creek is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and "water of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

165.   The March 2, 2009 and June 1, 2009 spills were not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

166.   The March 2, 2009 and June 1, 2009 spills were each a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

167.   The March 2, 2009 and June 1, 2009 spills each entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

168.   The March 2, 2009 and June 1, 2009 spills were each an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1321(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

<u>Summerland Oil Field Spill, Jones County, Mississippi</u>

169.   On or about March 9, 2011, at least 3 barrels of crude oil discharged from a sump of an oil well operated by the Defendant.  The crude oil entered a perennial off-shoot of the Leaf River or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (March 9, 2011 spill).

170.   Upon information and belief, the purported cause of the March 9, 2011 spill was heavy rain that washed out oil from the sump of an oil well.

171.   The sump and oil well described in Paragraph 169are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

172.   The perennial off-shoot of the Leaf River flows into the Leaf River, which merges with the Chickasawhay River to form the Pascagoula River, which flows into Pascagoula Bay, a bay of the Gulf of Mexico.

173.   The perennial off-shoot of the Leaf River is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and are "water of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

174.   The March 9, 2011 spill was not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

175.   The March 9, 2011 spill was a discharge of oil within the meaning of

Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

176. The March 9, 2011 spill entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b) (3), and 40 C.F.R. § 110.3.

177. The March 9, 2011 discharge was an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

### Tinsley Oil Field Spills, Yazoo County, Mississippi

178. On or about July 31, 2013, at least 5,000 barrels of production fluid discharged from a fiberglass line owned or operated by Defendant. The production fluid entered an unnamed, perennial, tributary to Perry Creek (Perry Creek Tributary) or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (July 31, 2013 spill).

179. Upon information and belief, the purported cause of the July 31, 2013 spill was ground settling and erosion which caused a connection point in the fiberglass line to break.

180. The fiberglass line in Paragraph 178 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

181. On or about May 18, 2014, at least 75 barrels of crude oil discharged from a containment area for a well head owned or operated by Defendant. The crude oil entered O'Neil Creek or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards (May 18, 2014 spill). O'Neil Creek is a perennial tributary of the Yazoo River.

182. The purported cause of the May 18, 2014 spill is unknown.

183.   The containment area and well head described in Paragraph 181 are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

184.   Perry Creek Tributary flows into Perry Creek, which flows into O'Neil Creek, which merges with the Yazoo River, which flows into the Mississippi River, which flows into the Gulf of Mexico.

185.   Perry Creek and O'Neil Creek, are "navigable waters" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and are "waters of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

186.   The July 31, 2013 and May 18, 2014 spills were not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

187.   The July 31, 2013 and May 18, 2014 spills were each a discharge of oil within the meaning of Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

188.   The July 31, 2013 and May 18, 2014 spills each entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

189.   The July 31, 2013 and May 18, 2014 spills were each an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

<u>West Mallalieu Oil Field Spill, Lincoln County, Mississippi</u>

190.   On or about January 26, 2011, at least 15 barrels of crude oil discharged from a flow line owned or operated by Defendant. The crude oil entered Jordan Creek or adjoining shorelines in sufficient quantity to cause a film, sheen, discoloration, sludge, emulsion, or violation of water quality standards

(January 26, 2011 spill).

191.   Upon information and belief, the purported cause of the January 26, 2011 spill was internal corrosion.

192.   The flow line described in Paragraph 190 is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

193.   Jordan Creek is a perennial stream that flows into Boone Creek, which flows into the Bogue Chitto River, which flows into Pearl River, which flows into Lake Borgne, an inlet into the Gulf of Mexico.

194.   Jordan Creek is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7), and "water of the state" within the meaning of Miss. Code Ann. § 49-17-5(1)(f).

195.   The January 26, 2011 spill was not authorized by the CWA, or by any permit or regulations issued pursuant to the CWA.

196.   The January 26, 2011 spill was a discharge of oil within the meaning Sections 311(a)(1) and (2), and 311(b)(3), of the CWA, 33 U.S.C. §§ 1321(a)(1) and (2), and 1321(b)(3).

197.   The January 26, 2011 discharge entered a water of the U.S. or adjoining shorelines in a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

198.   The January 26, 2011 discharge was an unlawful discharge of a pollutant within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a) and unlawful pollution of the waters of the state within the meaning of Miss. Code Ann. § 49-17-29.

Violations of Oil Pollution Prevention Regulations

199.   At all times relevant to this action, Defendant also owned or operated six Enhanced Oil Recovery EOR Facilities (EOR Facilities) for injection, after oil separation, of production fluid at the following facilities in Mississippi: Brookhaven, Heidelberg, Little Creek, Mallalieu, Olive (also known as the Olive,

28

McComb, and Smithdale Facility), and Tinsley.  Each EOR Facility includes tanks, wells, piping and other equipment.  The EOR Facilities and the oil and gas production facilities located in the Eucutta Oil Field as described in Paragraph 33 (Eucutta Oil Field Facility) were in operation on or before August 16, 2002.

200.   At all times relevant to this action, the EOR Facilities and the Eucutta Oil Field Facility were located on land within the United States other than submerged lands.

201.   At all times relevant to this action, the EOR Facilities and the Eucutta Oil Field Facility were "non-transportation-related onshore facilities" within the meaning of 40 C.F.R. §§ 112.1 and 112.2 and Section 311(a)(10) of the CWA.

202.   At all times relevant to this action, the EOR Facilities and the Eucutta Oil Field Facility were engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using or consuming oil and oil products.

203.   At all times relevant to this action, the EOR Facilities and the Eucutta Oil Field Facility had oil in one or more aboveground containers, or containers that were not "permanently closed" as defined in 40 C.F.R. § 112.2.

204.   Drainage from the Brookhaven EOR Facility travels down gradient for approximately 1,500 feet before entering an unnamed tributary of the West Bogue Chitto River (West Bogue Chitto River Tributary), which flows into the West Bogue Chitto River, which flows into the Bogue Chitto River, which flows into the Pearl River, which flows into Lake Borgne, which is an inlet in the Gulf of Mexico.

205.   West Bogue Chitto River Tributary, the West Bogue Chitto River, the Bogue Chitto River, the Pearl River, Lake Borgne, and the Gulf of Mexico are "navigable waters" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

206.   Drainage from the Heidelberg EOR Facility travels down gradient for

approximately 1,500 feet before entering Prairie Creek, which flows into the Bogue Homo River, which flows into the Leaf River, which merges with the Chickasawhay River to form the Pascagoula River, which flows into Pascagoula Bay, which is a bay of the Gulf of Mexico.

207.   Prairie Creek is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

208.   Drainage from the Little Creek EOR Facility travels down gradient for approximately 500 feet before entering an unnamed perennial tributary of Little Creek (Little Creek Tributary), which flows into Little Creek, which flows into West Topisaw Creek, which flows into Topisaw Creek, which flows into the Bogue Chitto River, which flows into the Pearl River, which flows into Lake Borgne, which is an inlet in the Gulf of Mexico.

209.   Little Creek Tributary is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

210.   Drainage from the Mallalieu EOR Facility travels down gradient for approximately 1,800 feet before entering an unnamed perennial tributary to Boone Creek (Boone Creek Tributary), which flows into Boone Creek, which flows into the Bogue Chitto River, which flows into the Pearl River, which flows into Lake Borgne, which is an inlet in the Gulf of Mexico.

211.   Boone Creek Tributary is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

212.   Drainage from the Olive EOR Facility travels down gradient for approximately 200 feet before entering an unnamed perennial tributary to the Tangipahoa River (Tangipahoa River Tributary), which flows into the Tangipahoa River, which flows into Lake Pontchartrain, which flows into Lake Borgne, which is an inlet in the Gulf of Mexico.

213.   Tangipahoa River Tributary is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3)

and 1362(7).

214.   Drainage from the Tinsley EOR Facility travels down gradient for approximately 200 feet before entering an unnamed perennial tributary of Perry Creek (Perry Creek Tributary), which flows into Perry Creek, which flows into O'Neil Creek, which flows into the Yazoo River, which flows into the Mississippi River, which flows into the Gulf of Mexico.

215.   Perry Creek Tributary is a "navigable water" within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

216.   At all times relevant to this action, each of the EOR Facilities and the Eucutta Oil Field Facility could, due to its location, reasonably have been expected to discharge oil into or upon the navigable waters of the United States or adjoining shorelines in quantities that: (a) violate applicable water quality standards; or (b) cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines, within the meaning of 40 C.F.R. § 110.3.

217.   At all times relevant to this action, each of the EOR Facilities and the Eucutta Oil Field Facility were subject to the Oil Pollution Prevention regulations set forth at 40 C.F.R. Part 112.

218.   At all times relevant to this action, each of the EOR Facilities had an oil storage capacity of at least 1,000,000 gallons.

219.   The water bodies described in Paragraphs 204 through 215 provide habitat for fish and wildlife.

220.   At all times relevant to this action, each of the EOR Facilities was located at a distance such that a discharge of oil could cause injury to fish and wildlife and sensitive environments.

221.   At all times relevant to this action, each of the EOR Facilities could, because of its location, reasonably be expected to cause substantial harm to the

environment by discharging oil into or on the navigable waters or adjoining shorelines.

222.   At all times relevant to this action, each of the EOR Facilities was subject to the Response Requirements of the Oil Pollution Prevention regulations in Subpart D of 40 C.F.R. Part 112.

223.   On or about July 15, 2000, the Little Creek EOR Facility began storing 1,000,000 gallons or more of oil. Defendant was the owner or operator of the Little Creek EOR Facility at that time but did not prepare and submit to EPA an FRP for the Little Creek EOR Facility, as required by 40 C.F.R. 112.20, until March 26, 2014.

224.   The FRP that Denbury submitted to EPA for the Little Creek EOR Facility failed to fully address some elements of Appendices C, D, E, and F of Part 112, as required by 40 C.F.R. § 112.20(h).  Defendant submitted amendments to the FRP for the Little Creek EOR Facility that had addressed these elements as of October 2014.

225.   On or about April 1, 2001, the Olive EOR Facility began storing 1,000,000 gallons or more of oil.  Defendant became the owner or operator of the Olive EOR Facility between 2003 and 2008 but did not prepare and submit to EPA an FRP for the Olive EOR Facility, as required by 40 C.F.R. 112.20, until March 26, 2014.

226.   The FRP that Denbury submitted to EPA for the Olive EOR Facility failed to fully address some elements of Appendices C, D, E, and F of Part 112, as required by 40 C.F.R. § 112.20(h). Defendant submitted amendments to FRP for the Olive EOR Facility that had addressed these elements as of October 2014.

227.   On or about April 1, 2001, the Mallalieu EOR Facility began storing 1,000,000 gallons or more of oil. Defendant became the owner or operator of the Mallalieu EOR Facility between April 1, 2001 and September 1, 2001, but did not prepare and submit to EPA an FRP, as required by 40 C.F.R. 112.20, until March

26, 2014.

228.   The FRP that Denbury submitted to EPA for the Mallalieu EOR Facility failed to fully address some elements of Appendices C, D, E, and F of Part 112, as required by 40 C.F.R. § 112.20(h). Defendant submitted amendments to the FRP for the Mallalieu EOR Facility that had addressed these elements as of October 2014.

229.   On or about January 1, 2005, the Brookhaven EOR Facility began storing 1,000,000 gallons or more of oil. Defendant was the owner or operator of the Brookhaven EOR Facility at that time but did not prepare and submit to EPA an FRP, as required by 40 C.F.R. 112.20, until March 26, 2014.

230.   The FRP that Denbury submitted to EPA for the Brookhaven EOR Facility failed to fully address some elements of Appendices C, D, E, and F of Part 112, as required by 40 C.F.R. § 112.20(h). Defendant submitted amendments to the FRP for the Brookhaven EOR Facility that had addressed these elements as of October 2014.

231.   On or about March 5, 2009, the Heidelberg EOR Facility began storing 1,000,000 gallons or more of oil. Defendant was the owner or operator of the Heidelberg EOR Facility at that time but did not prepare and submit to EPA an FRP, as required by 40 C.F.R. 112.20, until October 2013.

232.   The FRP that Denbury submitted to EPA for the Heidelberg EOR Facility failed to fully address some elements of Appendices C, D, E, and F of Part 112, as required by 40 C.F.R. § 112.20(h). Defendant submitted amendments to the FRP for the Heidelberg EOR Facility that had addressed these elements as of October 2014.

233.   On or about March 1, 2008, the Tinsley EOR Facility began storing 1,000,000 million gallons or more of oil. Defendant was the owner or operator of the Tinsley EOR Facility at that time but did not prepare and submit to EPA an FRP for the Tinsley EOR Facility, as required by 40 C.F.R. 112.20, until June 17,

2013.

234.   The FRP that Denbury submitted to EPA for the Tinsley EOR Facility failed to fully address some elements of Appendices C, D, E, and F of Part 112, as required by 40 C.F.R. § 112.20(h). Defendant submitted amendments to the FRP for the Tinsley EOR Facility that had addressed these elements as of February 2, 2015.

235.   On December 5, 2013, EPA inspected Denbury's Tinsley EOR Facility located at 500 Tinsley Road, in Tinsley, Mississippi to evaluate its compliance with Section 311(j) of the CWA, 33 U.S.C. § 1321(j), and the applicable requirements of the Oil Pollution Prevention regulation at 40 C.F.R Part 112.  As part of the inspection, the EPA reviewed the Facility's SPCC Plan, dated August 20, 2011.

236.   The Tinsley EOR Facility's SPCC Plan, dated August 20, 2011, failed to comply with the requirements of 40 C.F.R. § 112.7, as required by 40 C.F.R. § 112.3.

237.   The Tinsley EOR Facility's SPCC Plan, dated August 20, 2011:

   a. Failed to include an accurate site diagram as required by 40 C.F.R. § 112.7(a)(3);

   b. Failed to include a prediction of the direction, rate of flow, and total quantity of oil that could be discharged from non-rack tanker truck loading/unloading areas, as required by 40 C.F.R. § 112.7(b);

   c. Failed to discuss the method or volume of secondary containment provided in the tanker truck loading/unloading areas, as required by 40 C.F.R. § 112.7(c);

   d. Failed to adequately discuss the oil-filled operational equipment requirements outlined in 40 C.F.R. §§ 112.7(c) and 40 C.F.R. § 112.7(k);

   e. Failed to discuss brittle fracture evaluation of field-constructed

containers, as required by 40 C.F.R. § 112.7(i);

f. Failed to discuss the type of overflow prevention devices provided on containers at the Facility, as required by 40 C.F.R. § 112.9(c)(4);

g. Failed to discuss sized secondary containment or alternative requirements in lieu of sized secondary containment for flow-through process vessels, as required by 40 C.F.R. §§ 112.9(c)(2) and/or 112.9(c)(5);

h. Failed to discuss sized secondary containment or alternative requirements in lieu of sized secondary containment for produced water containers, as required by 40 C.F.R. § 112.9(c)(6);

i. Failed to discuss saltwater disposal facility inspections, as required by 40 C.F.R. § 112.9(d)(2); and

j. Failed to adequately discuss a flow line/intra-facility gathering line maintenance program, as required by 40 C.F.R. § 112.9(d)(4)(i-iv).

238. On June 24, 2014, Defendant submitted to EPA amendments to the Tinsley EOR Facility's SPCC Plan to address these failures.

239. Pursuant to 40 C.F.R. § 112.9(c)(4), owners or operators of onshore facilities subject to the Oil Pollution Prevention Regulations must update or engineer their tank battery installations to prevent discharges by providing one of the controls listed in this section. Defendant violated 40 C.F.R. § 112.9(c)(4) when it failed to provide adequate engineering controls on tanks at its Heidelberg EOR and Eucutta Oil Field Facilities, which resulted in the December 10, 2009 and January 16, 2010 spills.

240. Pursuant to 40 C.F.R. § 112.9(b)(1) owners or operators of onshore facilities subject to the Oil Pollution Prevention Regulations must close and seal at all times drains of dikes or drains of equivalent measures, except when draining uncontaminated rainwater. Defendant violation 40 C.F.R. § 112.9(b)(1) when it failed to close and seal a drain valve at the Heidelberg EOR Facility, when not

draining uncontaminated rainwater, resulting in the February 14, 2013 spill.

## FIRST CLAIM FOR RELIEF

### Violations of Section 311(b)(3) of the Clean Water Act

241.   Paragraphs 1 through 240 are realleged and incorporated herein by reference.

242.   The discharges alleged in Paragraphs 38 through 198, violated Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

243.   Subject to a reasonable opportunity for further investigation or discovery, these violations are likely to continue unless enjoined by an order of the Court.

244.   Pursuant to Section 311(b) (7) (A) and (D) of the CWA, 33 U.S.C. § 1321(b)(7)(A) and (D), Defendant is liable for a civil penalty of up to $1,100 per barrel of oil discharged on or before December 6, 2013, and up to $2,100 per barrel of oil discharged after December 6, 2013, or, if it is established that the violations were the result of gross negligence or willful misconduct, a civil penalty of up to $4,300 per barrel of oil discharged on or before December 6, 2013, and up to $5,300 per barrel for discharges occurring after December 6, 2013.

## SECOND CLAIM FOR RELIEF

### Violations of Section 301 of the Clean Water Act

245.   Paragraphs 1 through 244 are realleged and incorporated herein by reference.

246.   The discharges alleged in Paragraphs 38 through 198 violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

247.   Subject to a reasonable opportunity for further investigation or discovery, violations of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), are likely to continue unless enjoined by an order of the Court.

248.   Defendant is subject to injunctive relief pursuant to Section 309(b) of

the CWA, 33 U.S.C. § 1319(b), to restrain the violations and require compliance.

## THIRD CLAIM FOR RELIEF

### Failure to Comply with Spill Prevention Control and Countermeasure Plan Requirements

### (40 C.F.R. Part 112)

249.   Paragraphs 1 through 248 are realleged and incorporated herein by reference.

250.   At the Tinsley EOR Facility, Defendant failed to prepare an SPCC Plan in accordance with the requirements of 40 C.F.R. Part 112, as required by 40 C.F.R. § 112.3, and/or failed to maintain an SPCC Plan in accordance with the requirements of 40 C.F.R. Part 112 (2002), as required by 40 C.F.R. § 112.3(a).

251.   At the Heidelberg EOR and Eucutta Oil Field Facilities, Defendant failed to implement an SPCC Plan in accordance with the requirements of 40 C.F.R. Part 112, as required by 40 C.F.R. § 112.3.

252.   When Defendant violated the SPCC Plan requirements of the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112, as described in Paragraphs 236 through 240, Defendant failed or refused to comply with regulations issued under subsection (j) of the CWA.

253.   Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), and 40 C.F.R. § 19, Defendant is liable for a civil penalty of up to $32,500 per day of violation for each violation of the Oil Pollution Prevention regulations occurring from March 15, 2004, through January 12, 2009, and up to $37,500 per day of violation for each violation of the Oil Pollution Prevention regulations occurring after January 12, 2009.

## FOURTH CLAIM FOR RELIEF

### Failure to Comply with Facility Response Plan Requirements

### (40 C.F.R. § 112.20)

254.   Paragraphs 1 through 253 are realleged and incorporated herein by

reference.

255.   When Defendant violated the FRP requirements of the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112, as described in Paragraphs 223 through 234, Defendant failed or refused to comply with regulations issued under subsection (j) of the CWA.

256.   Pursuant to Section 311(b) (7) (C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), and 40 C.F.R. § 19, Defendant is liable for a civil penalty of up to $32,500 per day of violation for each such violation occurring from March 15, 2004, through January 12, 2009, and up to $37,500 per day of violation for each such violation occurring after January 12, 2009.

FIFTH CLAIM FOR RELIEF

Violations of the Mississippi Air and Water Pollution Control Law

257.   Paragraphs 1 through 256 are realleged and incorporated herein by reference.

258.   The discharges alleged in Paragraphs 86 through 198 violated Miss. Code Ann. § 49-17-29.

259.   Pursuant to Miss. Code Ann. § 49-17-43, Defendant is liable for a civil penalty of up to $25,000 per day during which a violation of Miss. Code Ann. § 49-17-29 occurs.

260.   Subject to a reasonable opportunity for further investigation or discovery, violations of Miss. Code Ann. § 49-17-29 are likely to continue unless enjoined by an order of the Court.

261.   Defendant is subject to injunctive relief pursuant Miss. Code Ann. § 49-17-43 to prevent further discharges from its facilities into waters of the United States.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the State of Mississippi respectfully request that the Court:

1.     Issue an order requiring the Defendant to take all appropriate action to prevent future discharges of oil into waters of the United States and waters of the state;

2.     Issue an order requiring the Defendant to take all appropriate action to prevent future discharges of pollutants to waters of the United States and waters of the state without authorization by a permit;

3.     Enter judgment against the Defendant and award the United States civil penalties from the Defendant in an amount up to $1,100 per barrel of oil discharged for the discharges alleged above that occurred on or before December 6, 2013, and up to $2,100 per barrel of oil for the discharges that occurred after December 6, 2013 or, if it is established that the discharges were the result of gross negligence or willful misconduct, in an amount up to $4,300 per barrel of oil discharged for discharges occurring on or before December 6, 2013 and up to $5,300 for the discharges occurring after December 6, 2013;

4.     Issue an order requiring the Defendant to take all appropriate action to ensure compliance with the Oil Pollution Prevention regulations;

5.     Enter judgment against the Defendant and award the United States civil penalties from the Defendant in an amount up to $32,500 per day of violation for each violation of the Oil Pollution Prevention regulations at 40 C.F.R. Part 112 occurring from March 15, 2004, through January 12, 2009, and up to $37,500 per day of violation for each violation of the Oil Pollution Prevention regulations occurring after January 12, 2009;

6.     Enter judgment against the Defendant and award the State of Mississippi civil penalties from the Defendant in an amount up to $25,000 per day of violation for each violation of Miss. Code Ann. § 49-17-29.

7.     Grant such other relief as this Court deems just and proper.

Respectfully submitted,

FOR THE UNITED STATES OF
AMERICA:

D. MICHAEL HURST, JR.
United States Attorney
Southern District of Mississippi

ELLEN M. MAHAN
Deputy Chief
Environmental Enforcement Section
United States Department of Justice

WILLIAM A. WEINISCHKE
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington D.C.  20044-7611
Tel. (202-514-4592
Bill.weinischke@usdoj.gov

KRISTI H. JOHNSON
MS Bar No. 102891
Assistant United States Attorney
Southern District of Mississippi
501 E. Court Street, Suite 4.430
Jackson, Mississippi  39201
Tel. (601) 965-4480
Kristijohnson2@usdoj.gov

OF COUNSEL:

MARIROSE PRATT
U.S. Environmental Protection Agency,
   Region 4
61 Forsyth Street, S.W.
Atlanta, GA  30303

CATHLEEN TIERNEY
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

FOR THE STATE OF MISSISSIPPI:

GRETCHEN L. ZMITROVICH
MS Bar No. 101470
Senior Attorney
Office of Pollution Control
Mississippi Department of Environmental
Quality
P.O. Box 2261
Jackson, MS 39225
Telephone:  601-961-5050
Facsimile:  601-961-5674
gzmitrovich@mdeq.ms.gov

ATTORNEY FOR PLAINTIFF STATE OF
MISSISSIPPI BY AND THROUGH THE
MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY AND THE
MISSISSIPPI DEPARTMENT OF
ENVIRONMENTAL QUALITY