## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF MISSISSIPPI

### Jackson Division

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF MISSISSIPPI<br><br>       Plaintiffs,<br><br>       v.<br><br>Denbury Onshore, LLC,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 3:19-cv-289-HTW-LRA

## CONSENT DECREE

## TABLE OF CONTENTS

I.      BACKGROUND ...................................................................................................4

II.      JURISDICTION AND VENUE .........................................................................5

III.      APPLICABILITY...............................................................................................6

IV.      DEFINITIONS....................................................................................................8

V.      CIVIL PENALTIES..........................................................................................10

VI.      INJUNCTIVE RELIEF....................................................................................11

         A. Mechanical Integrity Program ...............................................................11

         B. Designation of Defendant's Environmental Officials.................................12

         C. Oil Discharge Notification and Response Protocol....................................13

         D. Personnel Training ................................................................................16

         E. Compliance with Oil Pollution Prevention Regulations .............................17

VII.      REPORTING REQUIREMENTS .....................................................................17

         A.      Semi-Annual Reports..............................................................17

         B.      Final Report .........................................................................18

         C.      Other Reporting Requirements ...............................................18

VIII.      CERTIFICATION ...........................................................................................18

IX.      STIPULATED PENALTIES ............................................................................19

X.      FORCE MAJEURE .........................................................................................24

XI.      DISPUTE RESOLUTION ...............................................................................26

XII.      INFORMATION COLLECTION AND RETENTION .......................................28

XIII.      EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS.............................30

XIV.    COSTS ........................................................................................................33

XV.     NOTICES ....................................................................................................33

XVI.    EFFECTIVE DATE .....................................................................................35

XVII.   RETENTION OF JURISDICTION ............................................................35

XVIII.  MODIFICATION ........................................................................................35

XIX.    TERMINATION ..........................................................................................36

XX.     PUBLIC PARTICIPATION ........................................................................37

XXI.    SIGNATORIES/SERVICE ..........................................................................37

XXII.   INTEGRATION ..........................................................................................38

XXIII.  TAX IDENTIFICATION ............................................................................38

XXIV.   FINAL JUDGMENT ...................................................................................39

## I.      BACKGROUND

1.  Plaintiffs, the United States of America, on behalf of the United States Environmental

Protection Agency ("EPA"), and the State of Mississippi ("Mississippi" or "State"), acting

through the Mississippi Commission on Environmental Quality and the Mississippi Department

of Environmental Quality (collectively, "MDEQ") have filed a complaint ("Complaint"),

concurrently with this Consent Decree, against Denbury Onshore, LLC ("Denbury" or

"Defendant"). The Complaint alleges that Defendant is liable for civil penalties and injunctive

relief, pursuant to the Clean Water Act, as amended ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and

the Mississippi Air and Water Pollution Control Law, Miss. Code Ann. §§ 49-17-1 *et seq.*,

resulting from various discharges of oil from August 8, 2008, through the date of lodging of this

Consent Decree, from Fields owned and/or operated by Defendant at the time of the discharge.

2.  The Plaintiffs further allege in the Complaint that Defendant is liable for violations of

Section 311(j) of the CWA, 33 U.S.C. § 1321(j), and the Oil Pollution Prevention regulations at

40 C.F.R. Part 112.

3.  Prior to entry of the Consent Decree, and during the negotiation period, Defendant has

taken the following actions with respect to the Fields subject to this Consent Decree towards

preventing future discharges and to ensure compliance with the Clean Water Act and the Oil

Pollution Prevention regulations:

   a.   established, updated, or implemented Spill Prevention, Control, and Countermeasure

        Plans ("SPCC Plans") and Federal Response Plans ("FRPs");

   b.   developed a well-established program for incident command system training that

        includes Incident Command System ("ICS") Levels 100, 200, & 300 training for all

        Denbury employees who might be assigned to an Incident Management Team; and

4

c.  updated and implemented company-wide emergency response guidelines, including

procedures for internal and external reporting of oil spills and incidents.

4.  Defendant does not admit any facts, legal conclusions, or liability to the Plaintiffs or

otherwise arising out of the allegations in the Complaint or by entering into this Consent Decree.

5.  The Parties recognize, and the Court by entering this Consent Decree finds, that this

Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between

the Parties, and that this Consent Decree is fair, reasonable and in the public interest.

**NOW, THEREFORE**, before taking any testimony and without adjudication or admission

of any issue of fact, law, or liability except as provided in Section II below, and with the consent

of the Parties, IT IS **HEREBY ADJUDGED AND DECREED** as follows:

## II.  JURISDICTION AND VENUE

6.  This Court has jurisdiction over the subject matter of the United States' claims pursuant

to 28 U.S.C. §§ 1331 (Federal Question), 1345 (United States as Plaintiff), 1355 (Fine, Penalty

or Forfeiture), and CWA Sections 309(b), 309(d), 311(b)(7)(E) and 311(n), 33 U.S.C.

§§ 1319(b), 1319(d), 1321(b)(7)(E) and 1321(n).

7.  This Court has jurisdiction over the subject matter of the State of Mississippi's claims

pursuant to 28 U.S.C. § 1367(a) (Supplemental Jurisdiction) because the State's claims are so

related to the federal claims that they form part of the same case or controversy.

8.  For the purposes of this Consent Decree, or any action to enforce this Consent Decree,

the Parties consent to the Court's jurisdiction, and stipulate that venue lies in this District

pursuant to 28 U.S.C. § 1391.

9.  Notice of the commencement of this action has been given to the States of Mississippi

and Alabama, as required by CWA Section 309(b), 33 U.S.C. § 1319(b).

### III.    APPLICABILITY

10. The obligations of this Consent Decree apply to and are binding upon the United States, the State of Mississippi, Defendant, and upon any successors, assigns or other entities or persons otherwise bound by law.

11. Except as provided herein, no transfer of ownership or operation of any Field or Fields, or any portion thereof, for which Defendant's obligations have not been terminated pursuant to Section XIX (Termination), whether in compliance with the procedures of this Section or otherwise, shall relieve Defendant of its obligation to ensure that the terms of this Consent Decree are implemented at such Field or Fields for as long as the terms of the Consent Decree remain in effect with respect to such Field or Fields.

12. In the event of a transfer of ownership or operation of any Field or Fields, or any portion thereof, for which Defendant's obligations have not been terminated pursuant to Section XIX (Termination), Defendant and the transferee shall agree in writing that the transferee shall undertake the obligations required by this Consent Decree that apply to such transferred Field or Fields until the obligations with respect to such Field or Fields have been terminated pursuant to Section XIX (Termination).  Furthermore, the written agreement between Defendant and the transferee shall be enforceable by the Plaintiffs as third-party beneficiaries.  For purposes of this paragraph, the "obligations required by this Consent Decree" shall mean, prospectively: 1) the remaining injunctive relief required to be performed by Section VI of this Consent Decree, including the Mechanical Integrity Program in Appendix B, or other program that is functionally similar to Appendix B in that it systematically reduces the risk of potential discharges of oil, and 2) all other provisions of this Consent Decree, including stipulated penalties and reporting requirements.

6

13. At least fourteen (14) Days prior to a transfer covered by Paragraph 12, Defendant shall provide a copy of this Consent Decree to the proposed transferee, and shall simultaneously provide to the Plaintiffs written notice of the prospective transfer, together with a copy of the provisions of the proposed written agreement to be executed by the transferee that meet the requirements of Paragraph 12.

14. Defendant shall be relieved of its obligations pursuant to the Consent Decree with respect to any transferred Field or Fields, or portion thereof, that has or have not yet been terminated pursuant to Section XIX (Termination) where Defendant has: (a) complied with Paragraph 12, including having entered into the required written agreement with the transferee, (b) complied with Paragraph 13, and (c) either: (i) complied with all its obligations pursuant to the Consent Decree and the CWA with respect to such Field or Fields, except for Section XIX (Termination) or (ii) the Plaintiffs and the transferee have agreed in writing to substitute the transferee for the Defendant as a party under the Consent Decree and thus to be bound by the terms thereof with respect to such Field or Fields.

15. Any attempt to transfer a Field or any portion of a Field upon which work is to be performed pursuant to this Consent Decree without complying with the provisions of this Section III (Applicability) constitutes a violation of this Consent Decree.

16. Paragraphs 11-14 of the Consent Decree shall not apply to a transaction in which an operational or ownership interest in any Field or Fields, or portion thereof, is sold, transferred, or otherwise utilized solely as collateral security in order to consummate a financing arrangement or credit facility, so long as Defendant remains the operator of the subject Field and therefore remains subject to and liable for all obligations and liabilities of this Consent Decree. Furthermore, Paragraphs 11-14 of the Consent Decree shall not apply if a financial institution or

lender acquires an ownership interest through foreclosure or similar involuntary process and Denbury does not operate the Field or Fields, or any portion thereof, in which such financial institution acquires an interest.

17. Nothing in this Consent Decree shall be construed to require Defendant to continue to operate any Field or Fields, or any portion thereof, provided that a decision not to operate any Field or Fields, or any portion thereof, does not relieve Defendant of any obligation under this Consent Decree.

18. Defendant shall provide a copy of this Consent Decree to all officers, employees, agents, and contractors whose duties might reasonably include compliance with any of its provisions. Defendant shall condition any contract to perform work required by the Consent Decree on the performance of the work being in conformity with the terms of this Consent Decree. In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure of any of its officers, directors, employees, agents or contractors to take actions necessary to comply with the provisions of this Consent Decree.

19. Defendant may not avoid compliance with this Consent Decree at any Field or Fields, or portions thereof, by transferring such Field or Fields, or portions thereof, to a direct or indirect subsidiary, affiliate, or an entity that shares common ownership with Defendant.

## IV.   **DEFINITIONS**

20. Except as specifically provided in this Paragraph and Appendix B, the definition of terms in the CWA and in 40 C.F.R. Parts 110 and 112 shall apply to this Consent Decree:

    a.    "Calendar Year" shall mean the period of time consisting of 365 or 366 days beginning on January 1 and continuing to and including December 31;

    b.    "Complaint" shall mean the complaint filed by Plaintiffs in this action;

8

c.  "Consent Decree" or "Decree" shall mean this Consent Decree and all Appendices attached herewith;

d.  "Day" shall mean a calendar day unless expressly stated to be a Business Day. "Business Day" shall mean any day other than a Saturday, Sunday, or federal holiday. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next Business Day;

e.  "Defendant" or "Denbury" shall mean Defendant Denbury Onshore, LLC.

f.  "Effective Date" shall mean the day this Consent Decree is entered by the Court;

g.  "EPA" shall mean the U.S. Environmental Protection Agency and any of its successor departments or agencies;

h.  "Field" or "Fields" shall mean the oil production units and other oil production operations, including enhanced oil recovery units, identified in Appendix A to this Consent Decree.

i.  "Interest" shall mean interest at the rate specified in 28 U.S.C. § 1961;

j.  "MDEQ" shall mean the Mississippi Department of Environmental Quality;

k.  "MI Program" shall mean the Mechanical Integrity Program described in Appendix B.

l.  "Mississippi" shall mean the State of Mississippi and all departments, agencies, and instrumentalities;

m.  "Paragraph" shall mean those portions of the Consent Decree identified by an Arabic numeral;

n.  "Parties" shall mean the United States, the State of Mississippi, and Denbury Onshore, LLC;

o.   "Plaintiffs" means the United States and the State of Mississippi;

p.   "Section" shall mean those portions of this Consent Decree identified by a Roman numeral;

q.   "Termination Date" means the date this Consent Decree terminates, as provided in Section XIX of this Consent Decree;

r.   "United States" shall mean the United States of America, and all of its departments, agencies, and instrumentalities, acting on behalf of EPA; and

s.   "Water Body" shall mean any water of the United States pursuant to the Clean Water Act and/or any water of the State of Mississippi, except groundwater, pursuant to Miss. Code Ann. § 49-17-5(f).

## V.   CIVIL PENALTIES

21. Within thirty (30) Days of the Effective Date of this Consent Decree, Defendant shall pay a civil penalty in the amount of $3,500,000, plus Interest accruing from January 7, 2019, for the violations alleged in the Complaint, as provided below.

a.   Defendant shall pay **$2,400,000**, plus Interest, to the United States, by Fedwire Electronic Funds Transfer ("EFT") in accordance with instructions provided by the Financial Litigation Unit of the Office of the United States Attorney for the Southern District of Mississippi.  Such monies are to be deposited in the Oil Spill Liability Trust Fund.  The payment shall reference the Civil Action docket number assigned to this case and DOJ Number 90-5-1-1-10733, and shall specify that the payment is made for CWA civil penalties to be deposited into the Oil Spill Liability Trust Fund pursuant to 33 U.S.C. § 1321(s), § 4303 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8). Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next

business day. Defendant shall simultaneously provide notice of payment in writing,

together with a copy of any transmittal documentation to the EPA and the U.S.

Department of Justice, in accordance with Section XV of this Consent Decree (Notices),

and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the Coast

Guard at the following addresses:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, Ohio 45268

> National Pollution Funds Center
> United States Coast Guard
> 4200 Wilson Boulevard, Suite 1000
> Arlington, Virginia 22203-1804

22. Defendant shall pay **$1,100,000**, plus Interest, to the State of Mississippi, by check

payable to "Mississippi Department of Environmental Quality," sent by certified mail to the

following address:

> Mississippi Department of Environmental Quality
> Attn: Accounts Receivable
> P.O. Box 2339
> Jackson, Mississippi 39225

23. Defendant shall not deduct any civil penalties paid under this Section in calculating

federal income tax.

## VI.  INJUNCTIVE RELIEF

### A. Mechanical Integrity Program

24. Defendant shall implement an MI Program for each Field, designed to prevent all

discharges of oil, in accordance with Appendix B and Appendix C.

## B. Designation of Defendant's Environmental Officials

25. Defendant has designated, and shall continue to require, its Director or Vice President ("VP") of Operations for each Field, with guidance from its Health, Safety, and Environmental ("HSE") Department, to be responsible for Defendant's compliance with Clean Water Act requirements, including the Oil Pollution Prevention regulations at 40 C.F.R. Part 112, which include spill prevention and response planning, and the obligations established by this Consent Decree. Defendant has also designated, and shall continue to require, a VP of Environmental, Health, and Safety ("VP of HSE") to be responsible for providing guidance and assistance with such compliance.  Denbury may designate a single individual to be its Director or VP of Operations at more than one Field and may designate a single individual to be the VP of HSE at more than one Field.

26. The VP of HSE shall have at least five (5) years of environmental management experience, including familiarity with Clean Water Act requirements, the Oil Pollution Prevention regulations at 40 C.F.R. Part 112, and applicable state Water Pollution Control Laws.

27. No later than ten (10) Days after the Effective Date of this Consent Decree, Defendant shall provide notice pursuant to Section XV (Notices) of this Consent Decree to Plaintiffs of the names and contact information of its Director or VP of Operations and the VP of HSE for each Field.

28. The VP of HSE and/or the Director or VP of Operations shall have the authority to direct Defendant's employees and contractors and to commit Defendant's funds as necessary to ensure compliance with all Oil Pollution Prevention regulations at 40 C.F.R. Part 112, effectively implement the MI Program, and to take other appropriate actions to prevent future discharges of oil at the Fields.

12

29. All notices required by this Subsection B shall include the name, title, physical address, cell and landline telephone number, and email address of each VP of HSE and the Director or VP of Operations.

30. This Section shall not be construed to restrict Defendant's authority to replace any successor Director or VPs of Operations and/or VP of HSE so long as each successor shall have the same applicable qualifications and responsibilities required by this Section. Defendant shall provide notice pursuant to Section XV (Notices) of this Consent Decree to Plaintiffs of any successor Director or VP of Operations and/or VP of HSE for any Field within thirty (30) Days of making such a change, including all information required in Paragraph 29.

31. This Section shall not be construed to restrict Defendant's authority to restructure its business or operations. Defendant may change the organizational title of and the individuals who perform the functions described in this Section from time-to-time so long as the responsibilities of the successor position and/or individuals have the same applicable qualifications and responsibilities required by this Section. Defendant shall provide notice pursuant to Section XV (Notices) of this Consent Decree to Plaintiffs of any change in the title of and/or names of the individuals who perform the functions described in this Section within thirty (30) Days of making such a change.

### C. Oil Discharge Notification and Response Protocol

32. For any discharge of oil, from any Denbury operations located in Alabama or Mississippi, that is required to be reported to the National Response Center ("NRC") ("NRC reportable discharge"), Defendant must submit a written report (Discharge Report) to the EPA pursuant to Section XV (Notices) of this Consent Decree, within five (5) Business Days of when Defendant is required to notify the NRC pursuant to Section 311(b)(5) of the CWA, 33 U.S.C.

§ 1321(b)(5), and 40 C.F.R. § 110.6. The Discharge Report must include the following information known at the time of the report:

a.  Date and time the discharge began and how long it occurred;

b.  Date and time the Defendant's employee, agent or contractor first had knowledge that the discharge occurred, and the name, title and contact information for that employee, agent or contractor;

c.  National Response Center identification number, if any;

d.  How the Defendant's employee, agent, or contractor came to have knowledge of the discharge;

e.  Name and job title of all discharge observers/reporters whether employed by Denbury or not;

f.  Whether a sheen, sludge, emulsion, or discoloration was observed, where, by whom, and the dates and times on which it was observed;

g.  Name(s) of all Water Bodies the discharge entered;

h.  Narrative description of discharge location, including latitude and longitude, and the distance and pathway the discharge traveled;

i.  A USGS map of the discharge location and the distance and pathway the material traveled;

j.  A description of the discharged material;

k.  A description of how the discharge occurred, including an identification of any equipment from which the discharged material was released, and how it migrated beyond secondary containment (if applicable);

14

l.  A best estimate calculation of the total volume of the discharge, the volume that reached a Water Body, and the volume recovered, including supporting documentation and an explanation of how the estimate was calculated;

m.  A determination of the underlying cause(s), or most likely cause(s), of the discharge;

n.  A description of all environmental impacts that resulted from the discharge;

o.  A description of all actions Defendant took, or plans to take, to respond to the discharge, including a discussion of the success of any efforts to minimize or mitigate the effects of the discharge;

p.  An estimate of the costs associated with responding to the discharge, including supporting documentation;

q.  Identification of expected repairs and corrective actions to ensure that another discharge does not occur from similar causes, a schedule for completion of these actions, and cost estimates for these expected repairs and corrective actions,

r.  Identification of any verbal or written reports made to any state, local or federal agency or response organization, including the date and time of the response and identification number, if any, and copies of any written reports related to the discharge made to any local, state, or federal entity; and

s.  Photographs (in unaltered electronic format) of the discharge, sheen, sludge, discoloration, emulsion, and cleanup activities that Denbury or its contractors have taken up until the date of the Discharge Report.

33. For any facility that experiences a NRC reportable discharge of oil of more than 1,000 U.S. gallons (23.8 barrels) in a single discharge or more than 42 U.S. gallons (1 barrel) in each of

15

two (2) discharges within any twelve (12)-month period, Defendant shall report to the Regional Administrator the information required by 40 C.F.R. § 112.4(a).

### D. Personnel Training

34. Within sixty (60) Days after the Effective Date of this Consent Decree, Defendant shall develop, electronically document, and commence to implement a Personnel Training Program that will ensure that all personnel, contractors and consultants, whose duties to perform work include compliance with any provisions of the Consent Decree with respect to any Field, are familiar with the requirements of this Consent Decree applicable to such duties, including but not limited to the MI Program and discharge notification procedures.

35. At a minimum the training program must include:

a.   Identification of training needed for each job category;

b.   A schedule for conducting: (i) initial training within one hundred and twenty (120) Days of the Effective Date, (ii) training of new employees hired more than one hundred and twenty (120) Days after the Effective Date within thirty (30) Days of being hired, (iii) training existing employees who take on new responsibilities more than one hundred and twenty (120) Days after the Effective Date within thirty (30) Days after taking on new responsibilities that require such training, and (iv) annual refresher training; and

c.   An electronic system for verifying and tracking completion of training.

36. Defendant shall provide a copy of the Personnel Training Program, and any related information, including but not limited to training materials, documentation of implementation, and signatures of all personnel who completed the training, to the Plaintiffs upon request, and no later than thirty (30) Days after such request.

16

### E.  Compliance with Oil Pollution Prevention Regulations

37. In accordance with 40 C.F.R. §§ 112.5 and 112.7, Defendant shall amend its SPCC Plans within six (6) months of any change in the design, construction, operation, or maintenance of any facility that materially affects its potential for a discharge, as described in 40 C.F.R. § 112.1(b).

## VII.    REPORTING REQUIREMENTS

### A.  Semi-Annual Reports

38. In addition to any other submittals or recordkeeping required pursuant to this Consent Decree, during the pendency of this Consent Decree, Defendant shall submit a Semi-Annual Report, every six (6) months beginning from the Effective Date, documenting its performance of the tasks required by this Consent Decree (the "Semi-Annual Report"), using the form provided in Appendix E.  If Defendant is not in compliance with any requirement of this Consent Decree, the Semi-Annual Report shall identify each area of noncompliance, the circumstances which have led to the noncompliance, and a schedule under which Defendant proposes to correct the noncompliance.  Defendant shall submit the Semi-Annual Report to the parties as specified in Section XV (Notices). The text of the Semi-Annual Report shall be in a searchable electronic format and shall include:

    a.   A summary of the Defendant's progress in implementing the tasks required by Section VI (Injunctive Relief) during the previous six (6) months;

    b.   A list of all Post Incident Analysis Reports required by Appendix B, Section III.8, generated during the semi-annual period if not previously provided upon request; and

    c.   Copies of any information reported to the Regional Administrator as required by 40 C.F.R. § 112.4(a) and Paragraph 33 of this Consent Decree.

**B. Final Report**

39. No later than thirty (30) Days after the Parties submit the Joint Notice of Partial or Final Termination pursuant to Paragraph 95, Defendant shall submit to the Plaintiffs a Final Report for each Field covered by the Joint Notice that shall provide a nonbinding description of: (1) the elements of the required injunctive relief, including the MI Program, that Defendant anticipates continuing after termination of the Consent Decree at the Field(s) at issue; and (2) the elements of the required injunctive relief that Defendant anticipates continuing in a modified form at the Field(s) at issue.  For administrative convenience, Defendant may include multiple Fields that meet the requirements of this Paragraph into one Final Report for all such Fields.

**C. Other Reporting Requirements**

40. Whenever any violation of this Consent Decree may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA and the State orally or by electronic transmission as soon as possible, but no later than twenty-four (24) hours after Defendant first knew of the violation.

41. The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the CWA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement applicable to the Fields.

42. Any information provided pursuant to this Consent Decree may be used by the United States, consistent with the protections provided in 40 C.F.R. Part 2, in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

**VIII.   CERTIFICATION**

43. Each written report, notice, protocol, plan, or other document submitted by Defendant under this Consent Decree shall be signed by at least one person with first-hand knowledge of

the accuracy of the information contained in the report and by at least one responsible corporate officer of the Defendant, who must provide the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge I may have and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## IX.    STIPULATED PENALTIES

44. Defendant shall be liable for stipulated penalties to the Plaintiffs for violations of, or failures to comply with, this Consent Decree as specified below, unless excused under Section X (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree including, but not limited to, any obligation required by Section V (Civil Penalty), Section VI (Injunctive Relief), and Section VII (Reporting Requirements) according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.  Other than the violations addressed by Paragraph 45 (Late Payment of Civil Penalty), Paragraph 46 (Notification of Oil Discharge), Paragraph 47 (Discharge Events), and Paragraph 48 (Appendices B and C), upon written demand as set forth in Paragraph 50, the stipulated penalty per violation per Day for noncompliance shall be:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th Day | $750 |
| 15th through 30th Day | $1,750 |

31st Day and beyond                                   $2,250

45. <u>Late Payment of Civil Penalty:</u>  If Defendant fails to pay the civil penalty required to be paid under Section V (Civil Penalties) of this Consent Decree when due, Defendant shall pay a stipulated penalty of $7,500 per Day to each Plaintiff not paid in full for each Day that payment is late. Late payment of the obligations stated in Section V (Civil Penalties) shall be made in accordance with the payment instructions provided in that Section. Stipulated penalties under this Paragraph shall be paid as provided in this Section IX (Stipulated Penalties).

46. <u>Notification of Oil Discharge:</u> If Defendant fails to immediately notify the NRC as required by 40 C.F.R. § 110.6, upon written demand as set forth in Paragraph 50, Defendant shall pay a stipulated penalty of $3,000 per Day from the Day the notice was required to the United States, until Defendant complies with the notification requirement.

47. <u>Discharge Events:</u>  Upon written demand, as set forth in Paragraph 50, Defendant shall pay a stipulated penalty per incident for each NRC-reportable discharge of oil from a Field, based on the total quantity of oil discharged, as set forth in this paragraph:

| Quantity in Barrels of Oil Discharged | Penalty Per Incident |
|---|---|
| less than 5 | $5,000 |
| 5 - 19 | $11,000 |
| 20 - 79 | $20,000 |
| 80 - 125 | $34,000 |
| more than 125 | $60,000 |

48. <u>Appendices B and C:</u>  Upon written demand as provided in Paragraph 50, Defendant shall pay the following stipulated penalties for violations of Appendix B or a scheduled deadline set forth in Appendix C:

20

| Category of Violation | Penalty per Field |
|---|---|
| Failure to complete an Initial Stage of the MI Program according to the schedule set forth in Appendix C, Tables 1 and 2, per Initial Stage | $2,000 per Day |
| After completing the Initial Stages of the MI Program pursuant to Appendix C, violation of any other elements of the MI Program not separately identified below | $500 per Violation |
| Failure to timely conduct a subsequent Risk Assessment pursuant to Appendix B, Section III.4 | $1,000 per Day |
| Failure to timely Resolve a Priority 1 or 2 Anomaly pursuant to Appendix B, Section III.6 | $1,000 per Day |
| Failure to timely Resolve a Priority 3 or 4 Anomaly pursuant to Appendix B, Section III.6 | $1,000 per Anomaly |
| Failure to timely conduct a Post Incident Analysis pursuant to Appendix B, Section III.8 | $1,000 per Day |

49. Except as provided in Paragraph 45, stipulated penalties under this Section shall begin to accrue on the Day after performance is due and shall continue each Day until performance is satisfactorily completed or the violation otherwise is cured. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

50. Defendant shall pay any stipulated penalty within thirty (30) Days of receiving written demand. Unless otherwise provided herein, the stipulated penalty for any violation with respect to a Field located outside of Mississippi shall be paid to the United States, and the stipulated penalty for any violation with respect to a Field located in Mississippi shall be paid 50% to the United States and 50% to the State of Mississippi. Defendant shall also pay Interest on any stipulated penalty for each Day the stipulated penalty is paid late, unless disputed in accordance with this Consent Decree.

51. The United States and/or MDEQ may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to it under this Consent Decree.

52. If Defendant disputes its obligation to pay part or all of a stipulated penalty, it shall initiate the dispute resolution procedures under Section XI (Dispute Resolution). If Defendant invokes dispute resolution, Defendant shall pay any amount not in dispute.

53. Stipulated penalties and Interest shall continue to accrue during any dispute resolution but need not be paid until the following:

a. If the dispute is resolved by agreement or by a decision of the United States that is not appealed to the Court, Defendant shall pay accrued stipulated penalties determined to be owing, together with Interest, to Plaintiffs within thirty (30) Days of the effective date of that agreement except as limited, waived, or agreed upon in the agreement;

b. If the dispute is submitted to the Court and Plaintiffs prevail in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with Interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph (c) of this Paragraph. If Defendant prevails, no accrued penalties associated with the dispute shall be due.

c. If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with Interest, within fifteen (15) Days of receiving the final appellate Court decision. As part of the resolution of any dispute under this Section, in appropriate circumstances the Parties may agree, or a Court may order, an extension or modification of the schedule for completion of activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution.

22

54. Defendant shall pay stipulated penalties owing to the United States by EFT in accordance with the instructions to be provided by the Financial Litigation Unit of the U.S. Attorney's Office for the Southern District of Mississippi. Payment of stipulated penalties shall be accompanied by transmittal correspondence that specifies that the payment is for stipulated penalties due under this Consent Decree to be deposited into the U.S. Treasury pursuant to 31 U.S.C. § 3302 and shall reference DOJ Number 90-5-1-1-10733 and the case name and number. Defendant shall send a copy of the transmittal correspondence to the United States as provided in Section XV (Notices).

55. Defendant shall pay stipulated penalties owing to the State of Mississippi by check payable to "Mississippi Department of Environmental Quality." The payment of stipulated penalties shall be accompanied by transmittal correspondence stating that any such payment is for stipulated penalties due under this Consent Decree and shall reference the case name and number, and be sent by certified mail to the following address:

> Mississippi Department of Environmental Quality
> Attn:  Accounts Receivable
> P.O. Box 2339
> Jackson, Mississippi  39225

56. Defendant shall not deduct stipulated penalties paid under this Section in calculating federal income tax.

57. If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for Interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment of stipulated penalties became due.  Nothing in this Paragraph shall be construed to limit the United States or the State of Mississippi from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

23

58. Subject to the provisions of Section XIII of the Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to Plaintiffs for Defendant's violation of this Consent Decree or applicable law.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## X.    FORCE MAJEURE

59. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it occurred to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

60. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendant shall provide notice orally or by electronic transmission to the Plaintiffs within seventy-two (72) hours of when Defendant first knew that the event might cause a delay.  Within seven (7) Days thereafter, Defendant shall provide in writing to the United States an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to

prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare, or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendant from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known of the event.

61. If EPA, after reasonable opportunity for review and comment by the State, determines that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under the Consent Decree that are affected by the Force Majeure event will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

62. If EPA, after a reasonable opportunity for review and comment by the State, does not determine that the delay or anticipated delay has been or will be caused by a Force Majeure event, EPA will notify Defendant in writing of its decision.

63. If Defendant elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than twenty (20) Days after receipt of EPA's notice.

In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 59 and 60 above. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to the EPA and the Court.

## XI.   **DISPUTE RESOLUTION**

64. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism for Defendant to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issues as a defense to an action by the Plaintiffs to enforce any obligation of Defendant arising under this Consent Decree.

65. Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations then the position advanced by the United States shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

66. <u>Formal Dispute Resolution</u>. Defendant shall invoke formal dispute resolution procedures, within the time period provided in Paragraph 65, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

67. The United States shall serve its Statement of Position within forty-five (45) Days of receipt of Defendant's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with Paragraph 68.

68. Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XV (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute. The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to Paragraph 67. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

69. The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

70. In any dispute brought under Paragraph 68, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree, the CWA, and any other applicable law, and that Defendant is entitled to relief. The United States reserve the right to assert that the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by the Plaintiffs under this Consent Decree should be accorded review on the administrative record under applicable principles of federal administrative law, and that Defendant should have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

71. The invocation of dispute resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree not directly in dispute. Stipulated penalties and Interest with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 53, above. If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII.   INFORMATION COLLECTION AND RETENTION

72. The Plaintiffs and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any Field covered by this Consent Decree, upon presentation of credentials, to:

a.   monitor the progress of activities required under this Consent Decree;

b.   verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

28

    c.   obtain documentary evidence, including photographs and similar data related to
compliance with the Consent Decree;

    d.   collect samples related to compliance with this Consent Decree; and

    e.   assess Defendant's compliance with this Consent Decree.

73. This Consent Decree in no way limits or affects any right of entry and inspection or any right to obtain information, held by EPA or the States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

74. Defendant shall retain, and shall instruct its contractors and agents to preserve, all underlying documents from which it has compiled any reports, protocols, plans or other documents or submissions required by this Consent Decree, and all non-identical copies of all documents, records, or other information within its or its contractors' or agents' possession or control, that relate in any manner to Defendant's performance of its obligations under this Consent Decree until five (5) years after termination of this Consent Decree.  At any time during implementation of this Consent Decree or during this information-retention period, Defendant shall provide to Plaintiffs copies of any requested documents, records, or other information required to be maintained under this Paragraph.  At the conclusion of the information-retention period, Defendant shall provide notice to Plaintiffs pursuant to Section XV (Notices) at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of this Paragraph. Upon request by the Plaintiffs, Defendant shall deliver any such documents, records, or other information to the Plaintiffs electronically.  Defendant may

assert that certain categories of documents, records, or other information are privileged under Paragraph 77, the attorney-client privilege or any other privilege recognized by federal law.

75. The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the CWA, its implementing regulations, or any other federal, state, or local law, regulation, or requirement.

76. Any information provided pursuant to this Consent Decree may be used by the United States in a proceeding to enforce the provisions of this Consent Decree, or as otherwise permitted by law.

77. Defendant may assert that notifications, submissions, documents, reports, records or other communications required by this Consent Decree contain trade secrets or confidential business information (CBI) pursuant to 40 C.F.R. Part 2 and/or applicable state law by specifically identifying or labeling, in writing, any confidential business information as such.

## XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

78. Entry of this Consent Decree and Defendant's compliance with the requirements herein resolves the civil claims of the United States and the State of Mississippi for the violations alleged in the Complaint through the date of lodging of this Consent Decree.

79. Notwithstanding Paragraph 78, the United States and the State of Mississippi reserve, and this Consent Decree is without prejudice to, their rights to institute a claim against Defendant with respect to all matters other than those expressly specified in Paragraph 78 including, but not limited to, the following:

a.   Claims based on a failure by Defendant to meet a requirement of this Consent Decree;

b.   Claims for criminal liability;

30

c.   Claims relating to the past, present, or future discharges of oil other than the discharges identified in the Complaint;

d.   Claims relating to past, present, or future violations of SPCC Plans, FRPs, Section 311(j) of the CWA, 33 U.S.C. §1321(j), or the Oil Pollution Prevention regulations at 40 C.F.R. Part 112 other than those violations identified in the Complaint;

e.   Claims for reimbursement for any disbursements from the federal Oil Spill Liability Trust Fund arising from the discharges alleged in the Complaint or other discharges or threats of discharge, pursuant to the Oil Pollution Act of 1990 ("OPA"), Section 311(f) of the CWA, including subrogated claims under Section 1015 of OPA, 33 U.S.C. § 2715;

f.   Claims for damages for injury to, destruction of, or loss of natural resources damages and costs of any natural resource damage assessments under the CWA, OPA, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), or other legal authority arising from any of the discharges alleged in the Complaint or other discharges.

80. Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to prevent or limit the rights of the Plaintiffs to obtain penalties or injunctive relief under any federal or state laws, regulations, or permit conditions, except as expressly specified herein.

81. In any subsequent administrative or judicial proceeding initiated by the United States or the State of Mississippi for unreimbursed costs, injunctive relief, damages, remediation, or other appropriate relief, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting,

31

or other defenses based upon any contention that the claims raised by the United States or the State of Mississippi in the subsequent proceeding were or should have been brought in the instant case, except with respect to the claims that have been specifically resolved pursuant to Paragraph 78.  Defendant reserves any and all claims and defenses not specifically addressed in this Section.

82. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall not be a defense to any action commenced pursuant to any federal or state laws, regulations, or permits. Plaintiffs do not, by their consent to entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, or with any other provisions of federal, state, or local laws, regulations, or permits.

83. This Consent Decree does not limit or affect the rights of Defendant or of the United States, or the State of Mississippi, against third parties, not a party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law, including but not limited to 33 U.S.C. § 1365(b).

84. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not a party to this Consent Decree.

85. Defendant hereby covenants not to sue and agrees not to assert any claims related to the discharges of oil, SPCC, or FRP violations identified in the Complaint, or response activities or natural resource damages in connection with any of the violations identified in the Complaint, against the United States or the State of Mississippi, pursuant to the CWA, OPA, the Mississippi

Air and Water Pollution Control Law, Miss. Code Ann. §§ 49-17-1 *et seq*., or any other federal

law, state law, or regulation, including, but not limited to, any direct or indirect claim for

reimbursement from the Oil Spill Liability Trust Fund, as defined in Section 1001 of OPA, 33

U.S.C. § 2701(11), and any direct or indirect claims for reimbursement from the Hazardous

Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507)

through CERCLA Sections 106(b)(2), 107, 111, 112, or 113 or any other provision of law.

## XIV.   COSTS

86. The Parties shall bear their own costs of this action, including attorneys' fees, except that

the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any

action necessary to collect any portion of the civil penalty or any stipulated penalties due but not

paid by Defendant, provided that the United States prevails in whole or in part in such action.

## XV.   NOTICES

87. Unless otherwise specified herein, whenever notifications, submissions, reports or

communications are required by this Consent Decree, they shall be made in writing and

addressed to all parties as follows, with a courtesy copy by email (except that any attachments

that are too voluminous to email need only be provided by mail):

AS TO THE UNITED STATES:

As to the U.S. Department of Justice:

> Chief (re: United States and State of Mississippi v. Denbury Onshore, LLC (DOJ
> # 90-5-1-1-10733))
> Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, D.D. 20044-7611
> Email: t.mariani@ENRD.USDOJ.Gov

As to the U.S. Environmental Protection Agency:

        Marirose J. Pratt
        Assistant Regional Counsel
        U.S. Environmental Protection Agency, Region 4
        61 Forsyth Street, S.W.
        Atlanta, Georgia 30303
        Email: pratt.marirose@epa.gov

        and

        Bill Joyner
        Drinking Water/Wastewater Section

        U.S. Environmental Protection Agency, Region 4
        61 Forsyth Street, S.W.
        Atlanta, Georgia 30303
        Email: joyner.william@epa.gov

AS TO THE STATE OF MISSISSIPPI:

        Chief, Environmental Compliance and Enforcement Division
        Office of Pollution Control
        Mississippi Department of Environmental Quality
        P.O. Box 2261
        Jackson, Mississippi 39225-2261
        Email: taultman@mdeq.ms.gov

        Gretchen L. Zmitrovich
        Senior Attorney
        Mississippi Department of Environmental Quality
        P.O. Box 2261
        Jackson, MS 39225-2261
        Email: gzmitrovich@mdcq.ms.gov

AS TO DEFENDANT:

        Jim Matthews
        Executive Vice President and General Counsel
        Denbury Resources Inc.
        5320 Legacy Drive
        Plano, TX 75024
        Email: jim.matthews@denbury.com

        Randy Robichaux, CSP, REM

Vice President –Environmental, Health, and Safety
Denbury Resources Inc.
5320 Legacy Drive
Plano, TX 75024
Email: randy.robichaux@denbury.com

88. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

89. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.   EFFECTIVE DATE

90. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.

## XVII.  RETENTION OF JURISDICTION

91. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XI (Dispute Resolution) and XVIII (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## XVIII. MODIFICATION

92. The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court. Changes to Appendix C are not considered material changes and may be agreed to by a designated representative of EPA Region 4, MDEQ, and Defendant.

93. Any disputes concerning modification to this Decree shall be resolved pursuant to Section XI of this Consent Decree (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 70, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XIX.   TERMINATION

94. After Defendant has: (a) substantially complied with Section VI (Injunctive Relief), Appendix B and Appendix C, at a Field for a period of at least three (3) years; and (b) paid the civil penalty and any accrued stipulated penalties required by the Consent Decree, Defendant may serve upon the United States and the State of Mississippi a Request for Partial Termination of the Consent Decree for such Field, stating that Defendant has satisfied these requirements with respect to that Field, together with all necessary supporting documentation.  For administrative convenience, Defendant may include multiple Fields that meet the requirements of this Paragraph into one request.  A request that meets the requirements of this Paragraph and includes all Fields for which Partial Termination has not yet occurred shall be denominated a Request for Final Termination.

95. Following Plaintiffs' receipt of any Request for Partial Termination or Request for Final Termination, the Parties shall confer informally concerning the request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination.  If the United States and the State of Mississippi agree that the Consent Decree may be partially or finally terminated, the Parties shall submit to the Court an appropriate Joint Notice of Partial Termination or Joint Notice of Final Termination.  The Joint

Notice shall identify the Field or Fields subject to the Joint Notice and recite that the requirements of the Consent Decree have been met with respect to such Field or Fields.

96. If the United States, after consultation with the State, does not agree that the Consent Decree may be partially or finally terminated, Defendant may invoke Dispute Resolution under Section XI of this Consent Decree. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until ninety (90) Days after service of its Request for Partial Termination or Request for Final Termination.

## XX.   **PUBLIC PARTICIPATION**

97. This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment, consistent with the procedures set forth in 28 C.F.R. § 50.7. The Plaintiffs reserve the right to withdraw or withhold its consent if the comments regarding this Consent Decree disclose facts or considerations indicating that this Consent Decree is inappropriate, improper, or inadequate. Defendant agrees not to oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Consent Decree. Defendant consents to entry of this Consent Decree without further notice.

## XXI.   **SIGNATORIES/SERVICE**

98. The Assistant Attorney General for the Environment and Natural Resources Division of the U.S. Department of Justice, on behalf of the United States, the Executive Director of the Mississippi Department of Environmental Quality, on behalf of the State of Mississippi, and the undersigned representative of Defendant, each certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

99. This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

100. Defendant agrees to accept service of process by mail or, if applicable, electronic case filing notices, with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court, including, but not limited to, service of a summons. The Parties agree that Defendant need not file an answer to the Complaint in this action unless or until this Court expressly declines to enter this Consent Decree.

## XXII. INTEGRATION

101. The following Appendices to this Consent Decree are part of the Consent Decree and fully enforceable as if set forth within this Consent Decree:

| Appendix A | Fields Subject to the Consent Decree |
| Appendix B | Mechanical Integrity Program |
| Appendix C | MI Program Schedule |
| Appendix D | List of Environmental Features |
| Appendix E | Form for Semi-Annual Report |

102. This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether verbal or written. No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents.

## XXIII. TAX IDENTIFICATION

103. For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Paragraphs 18, 24 through 40, 43, 72, and 74, and related Appendices A through E, are restitution or required to come into compliance with law.

## XXIV. **FINAL JUDGMENT**

104. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the United States, the State of Mississippi, and Defendant. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Federal Rules of Civil Procedure 54 and 58.

This Consent Decree is dated and entered this ___5th___ day of September, 2019.

_s/ HENRY T. WINGATE_____
UNITED STATES DISTRICT JUDGE

39

[THIS PAGE INTENTIONALLY LEFT BLANK]

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Denbury Onshore, LLC* FOR PLAINTIFF UNITED STATES OF AMERICA:

Date: 4-5-2019

Ellen M. Mahan
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611

Date: 4/5/2019

William A. Weinischke
Senior Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Denbury Onshore, LLC* FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):

Date:   4/5/2019

Kristi H. Johnson

Kristi H. Johnson
MS Bar No. 102891
Assistant United States Attorney
Southern District of Mississippi
501 E. Court Street, Suite 4.430
Jackson, Mississippi  39201

43

[THIS PAGE INTENTIONALLY LEFT BLANK]

**THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Denbury Onshore, LLC* FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):**

Leif Palmer
Regional Counsel
Office of Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303-8960

Marirose J. Pratt.
Associate Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303-8960

**THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of** *United States v. Denbury Onshore, LLC* **FOR PLAINTIFF UNITED STATES OF AMERICA (Continued**

Susan Parker Bodine
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. EPA
Mail Code 2243A
1200 Pennsylvania Ave., N.W.
Washington, D.C.  20460

Cathleen Gillen Tierney
Senior Attorney
Office of Enforcement and Compliance
Assurance
U.S. EPA
Mail Code 2243A
1200 Pennsylvania Ave., N.W.
Washington, D.C.  20460

47

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Denbury Onshore, LLC* FOR PLAINTIFF STATE OF MISSISSIPPI BY AND THROUGH THE MISSISSIPPI COMMISSION ON ENVIRONMENTAL QUALITY AND THE MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY:

Gretchen L. Zmitrovich
Senior Attorney
Office of Pollution Control
Mississippi Department of Environmental Quality
PO Box 2261
Jackson, Mississippi  39225-2261

49

**THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of** *United States v. Denbury Onshore, LLC* **FOR DEFENDANT DENBURY ONSHORE, LLC:**

Name: James S. Matthews

Title: EVP + General Counsel

## Appendix A

### Fields Subject to the Consent Decree

The following Fields (including adjacent oil production leases operated by Denbury), which are identified on the attached maps, are subject to the Consent Decree.

1. East Heidelberg, MS

2. West Heidelberg, MS

3. Tinsley, MS

4. East Eucutta, MS

5. West Mallalieu, MS

6. Martinville, MS

7. Soso, MS



**EAST HEIDELBERG**

- Active Wells
- Abandoned Wells
- Unit Boundary



Miles
0    0.25    0.5



WEST HEIDELBERG

Denbury

Active Wells
Abandoned Wells
Unit Boundary

Miles
0    0.25   0.5





**EAST EUCUTTA**

Unit Boundary
Abandoned Wells
Active Wells



WEST MALLALIEU

Denbury

Miles
0   0.25   0.5

Active Wells ●
Abandoned Wells ●
Unit Boundary ▢



- ● Active Wells
- ● Abandoned Wells
- ▭ Unit Boundary

MARTINVILLE

Denbury

Miles
0    0.25    0.5



Active Wells

Abandoned Wells

Unit Boundary

SOSO

Denbury

Miles
0   0.5   1

## APPENDIX B

### Mechanical Integrity Program

#### I.  Definitions

The following definitions, as well as Section IV (Definitions) of the Consent Decree, shall apply to this Appendix B:

a.  "Anomaly" or "anomalies" shall mean any abnormality or abnormalities identified on a Field Component including, but not limited to, the following:  a) equipment degradation and/or malfunctions, internal and external corrosion (on Pipelines, Tanks, valves, etc.), cracks, dents, outside force damage, and inadequate depth of cover; b) deficiencies and/or discrepancies in system operations, Calculated Remaining Life or manufacturer specifications; and c) any other conditions in Field Components and/or operations that, if not addressed, could lead to a Field Component Incident.

b.  "Calculated Remaining Life" shall mean remaining life as calculated pursuant to Section III(5)(d) of the MI Program for those Field Components covered by that subsection.

c.  "Calendar Year" shall mean the period of time consisting of 365 or 366 days beginning on January 1 and continuing to and including December 31.

d.  "Central Facility" shall mean the area of any Tank battery, test site, meter site, or processing facility, including all associated structures (such as Secondary Containment, storm drains, oil storage areas, transfer or loading areas, pits or ponds), within which multiple Field Components are located.

e.  "Denbury" shall mean Defendant Denbury Onshore, LLC.

f.  "Discovery" shall mean the date on which Denbury first had knowledge of the information requiring action under the MI Program. Denbury shall have knowledge of information known to an independent contractor or other third party when that party's information is received by an employee of Denbury.

g.  "Field" or "Fields" shall mean the Fields identified in Appendix A to the Consent Decree.

h.  "Field Component" or "Field Components" shall mean the following In-use equipment: 1) Pipelines, Tanks, and Vessels that process or store oil, and 2) associated Safety Devices; and shall exclude equipment that only processes or stores fresh water, carbon dioxide, or natural gas.

i.  "Field Component Incident" shall mean an incident involving a Field Component that causes the Field Component to discharge oil or causes a discharge of oil from other equipment.

1

j.     "Field Map Component" or "Field Map Components" shall mean In-use Pipelines and Central Facilities, and any Well whether active, shut in, abandoned, or plugged.

k.     "In-use" shall mean: a) being used as part of Denbury's operations (even if idle) and b) not permanently closed by Denbury within the meaning of 40 C.F.R. § 112.2. "In-use" shall not be applicable to equipment that has never transported or held oil.

l.     "Inspection" shall mean the Visual Surveillance and American Petroleum Institute (API) Inspections as provided in Section III(5) of the MI Program.

m.     "MIMS" shall mean the Mechanical Integrity Management System, which is composed of several electronic data systems for managing data required by Section III(9) of the MI Program.

n.     "MI Program" shall mean the Mechanical Integrity Program described in this Appendix B.

o.     "Pipeline" or "Pipelines" shall mean any oil piping outside of Secondary Containment, such as flow lines and gathering lines, whether above- or below-ground.

p.     "Resolve" or "Resolving" shall mean to take, or taking, appropriate action(s) to address an Anomaly, including, but not limited to, repairing, replacing, permanently closing within the meaning of 40 C.F.R. § 112.2, taking the Field Component out of service, changing its service, or taking other appropriate action(s) to address an Anomaly.

q.     "Safety Device" or "Safety Devices" shall mean any level safety switches, pressure safety switches, pressure safety valves, shutdown/surface safety valves, and temperature safety switches used to prevent or mitigate discharges of oil.

r.     "Secondary Containment" shall mean a containment system pursuant to 40 C.F.R. § 112.7(c).

s.     "Tank" or "Tanks" shall mean any container operated at or near atmospheric pressure, and its associated piping, used for processing or storing oil.

t.     "Vessel" or "Vessels" shall mean any pressurized container, and its associated piping, used for processing oil, such as for separation, dehydration, storage, or surge.

u.     "Well" or "Wells" shall mean the surface location of a wellbore and any associated above-ground structure.

v.     "Water Body" shall mean any water of the United States pursuant to the Clean Water Act and/or any water of the State of Mississippi, except groundwater, pursuant to Miss. Code Ann. Section 49-17-5(f).

## II.   Introduction

Denbury shall implement the MI Program for each Field in accordance with this Appendix B and the schedules set forth in Appendix C to the Consent Decree. The MI Program shall include the following elements: 1) Field Surveys, 2) Field Registers, 3) Field Maps, 4) Risk Assessments, 5) Inspections, 6) Anomaly Resolution, 7) Operation and Maintenance, 8) Post Incident Analysis, and 9) MIMS.

The following Figure 1 depicts Denbury's MI risk-based planning process generally, including references to all elements of the MI Program:

### Figure 1 – Planning Process

### (adapted as modified by Denbury from API Recommended Practice 580)



### III.   MI Program Elements

### 1.   Field Surveys

Denbury shall complete a survey for each Field ("Field Survey").  As part of the Field Survey, Denbury shall identify all Field Components and Field Map Components within each Field.

Denbury shall then identify the Global Positioning System ("GPS") coordinates for all Field Map Components identified. All Field Components within a Central Facility shall be represented by the single GPS coordinates of the Central Facility in which they are located. After the Field Survey is complete for each Field, Denbury shall only be required to include in Sections III(2)-(9) of the MI Program those Field Components and Field Map Components that Denbury identified during the Field Survey. However, if Denbury subsequently identifies or becomes aware of any other Field Components or Field Map Components while implementing the remainder of the MI Program, Denbury shall incorporate such other Field Components and Field Map Components into the MI Program at that time in accordance with Section III(9).

Additionally, as part of the Field Survey, Denbury shall also determine and/or confirm the attributes of each identified Field Component and Field Map Component, including but not limited to the following:

     a.     For each Pipeline: material of construction (e.g. steel or fiberglass), diameter, length, age and date of installation (to the extent known), depth of cover for buried pipelines at last depth of cover survey and date of such survey (if no depth of cover survey has been conducted, indicate depth as an estimate), material being transported, pressure rating, and type(s) of corrosion protection;

     b.     For each Tank and Vessel: materials of construction, storage capacities, age and date of installation (to the extent known), materials being stored, whether it is above- or below-ground, and type(s) of corrosion protection;

     c.     For each Safety Device: the type of device (e.g., whether the device is an automatic shutdown device, an audible alarm, a visual alarm, a process flow controller, etc.), age and date of installation (to the extent known), location, current condition, and any applicable manufacturer recommendations for reliability testing more frequently than once per year;

     d.     For each Well: age (to the extent known) and status (whether it is active, shut in, abandoned, or plugged); and

     e.     For each Central Facility: status (whether it is In-use or not).

Denbury shall conduct the Field Survey in accordance with sound engineering judgment and applicable or analogous industry standards and practices. Denbury shall include the results of the Field Survey in MIMS.

## 2. Field Register

Denbury shall complete a register for each Field ("Field Register") based on the information obtained through the Field Survey. The Field Register shall be an electronic database of relevant information for each Field Component. Relevant information shall at a minimum include all information required to be gathered pursuant to the Field Survey, including the attributes listed in Section III.1.a.-e. above.

Denbury shall maintain and update the Field Register in MIMS on an ongoing and continuing basis to maintain accurate information and reflect new information and changes.

3. **Field Map**

Denbury shall complete and maintain an electronic Geographic Information System ("GIS") mapping system ("Field Map") for each Field which will depict, at a minimum, the Field Map Components. The Field Maps shall also depict, for each Pipeline, where the Pipeline crosses a Water Body. In addition, the Field Maps shall depict, for each Field Map Component, where the Field Map Component is located within 1320 feet and/or within 660 feet of any Water Body. At a minimum, each Field Map shall also incorporate: 1) the U.S. Department of Interior, Geological Survey 7.5 minute (topographic) maps; 2) the U.S. Department of the Interior Fish and Wildlife Survey; 3) National Wetland Inventory data on the topography of the area and the location and character of wetlands, creeks, streams, rivers, and other Water Bodies; and 4) any other publicly available information and any other information in Denbury's possession on existing environmental features identified in Appendix D (List of Environmental Features) to the Consent Decree.

Denbury shall update each Field Map concurrently with any updates made to the Field Register that affect the Field Map. Denbury shall also review the most recent applicable versions of items (1)-(4) in the preceding paragraph once every Calendar Year and update the Field Maps to reflect any changes.

4. **Risk Assessment**

Denbury shall conduct risk assessments ("Risk Assessments") for each Field Component, except for Safety Devices, which will instead be subject to annual reliability testing as required by Section III(5)(a). The Risk Assessments will evaluate the likelihood of a Field Component Incident ("Likelihood") and the potential environmental consequence of a Field Component Incident ("Potential Environmental Consequence"). As part of each Risk Assessment, Denbury shall use these Likelihood and Potential Environmental Consequence evaluations to assign a criticality ranking ("Criticality Ranking") for each Field Component, in accordance with Table 3 ("Risk Assessment Matrix").

Denbury shall not include as a factor in the Risk Assessments pursuant to the MI Program any consideration of the financial costs, or the negative impact on production, profits, or operations, or any other hardships that may occur as a result of performing Inspections or taking corrective actions to address the risk of failure. However, Denbury may at its discretion include health, safety, or business risk factors in its evaluation of the Potential Environmental Consequence for a Field Component, but only to the extent doing so does not decrease the Criticality Ranking.

The first Risk Assessment that Denbury shall perform for each Field is the "baseline" Risk Assessment for that Field. The baseline and all subsequent Risk Assessments shall cover all Field Components in that Field. Denbury shall complete the baseline Risk Assessments according to the schedule set forth in Appendix C to the Consent Decree. Denbury shall complete a subsequent Risk Assessment for all Field Components in each Field on a recurring annual basis by the end of the month of the one-year anniversary of the month in which the prior Risk Assessment for that Field was completed. For each Risk Assessment, Denbury shall use all information known to Denbury, including but not limited to, the Field Survey, Field Register, Field Map, prior Risk Assessments, and all other information in MIMS.

a.   **Assessing Potential Environmental Consequence of a Field Component Incident**

Denbury shall determine the Potential Environmental Consequence of a Field Component Incident category ("Consequence Category") for each Field Component based on, at a minimum, the criteria set forth in Table 1. Denbury shall use information in MIMS or otherwise known to Denbury. Likelihood of Failure criteria do not have any bearing on the selection of a Consequence Category.

Denbury shall select the Consequence Category for each Field Component using a "top down" approach by starting with the "Very High" Consequence Category and selecting a lower Consequence Category only where Denbury has information to justify moving it to a lower Consequence Category. If Denbury does not have information on a Field Component that is sufficient to support assignment of any Consequence Category, Denbury shall assign the Very High Consequence Category to that Field Component, until it obtains information to support a lower Consequence Category. Denbury shall document, in MIMS, the Consequence Category for each Field Component, including any reclassification, and the reason(s) for each Consequence Category assignment or reclassification.

**Table 1**

| Consequence Category | Potential Environmental Consequence of a Field Component Incident Selection Criteria |
|---|---|
| VERY HIGH 5 | Any Field Component with a capacity of/or daily throughput that is greater than 500 barrels (bbls) that is located outside of Secondary Containment and is within 660 feet from a Water Body.<br><br>Field Components in this category also include any Field Component for which Denbury does not have information to support assignment of a Consequence Category. |
| HIGH 4 | Any Field Component with a capacity of/or daily throughput that is less than or equal to 500 bbls that is located outside of Secondary Containment and is located within 660 feet from a Water Body. |
| MODERATE 3 | Any Field Component (of any size) that is located outside Secondary Containment and is located between 660-1320 feet of a Water Body. |
| VERY LOW 2 | Any Field Component (of any size) that is located outside Secondary Containment and is beyond 1320 feet from a Water Body. |
| REMOTE 1 | Any Field Component (of any size) that is located entirely within Secondary Containment. |

b.   **Assessing Likelihood of a Field Component Incident**

Denbury shall determine the Likelihood of a Field Component Incident category ("Likelihood Category") for each Field Component based on, at a minimum, the criteria set forth in Table 2. For each Field Component, Denbury shall assign the highest category from Table 2 for which any one of the Likelihood of Field Component selection criteria is present.

Denbury shall also consider any other factor(s) that could increase the likelihood of a Field Component Incident to a higher level. A non-exclusive list of potentially-relevant factors that Denbury may consider include: 1) age; 2) historical data, including Inspection results, installation information, condition, and repairs; 3) years in active service; 4) operating history, including time periods when out of service or when operated beyond design tolerances; 5) history of prior failure; 6) performance of Field Components with the same or similar design or in similar service; 7) type of corrosion (internal or external); 8) degree and extent of corrosion; 9) corrosion rates; 10) internal/external coatings; 11) lack of use corrosion inhibitors; 12) cathodic protection; 13) environmental conditions that might contribute to corrosion (e.g. presence of water); 14) pressure cycles; 15) chance of outside force, third party or excavation damage; 16) process chemistry; 17) flow rates; 18) Safety Device testing programs and results; and 19) all other information known to Denbury. Potential Environmental Consequence criteria do not have any bearing on the selection of a Likelihood Category.

Denbury shall select the Likelihood Category for each Field Component using a "top down" approach by starting with the "Very High" Likelihood Category and selecting a lower Likelihood Category only where Denbury has information to justify moving it to a lower Likelihood Category. If Denbury does not have information on a Field Component that is sufficient to support assignment of any Likelihood Category, Denbury shall assign the Very High Likelihood Category to that Field Component, until it obtains information to support a lower Likelihood Category. Denbury shall document, in MIMS, the Likelihood Category for each Field Component, including any reclassification, and the reason(s) for each Likelihood Category assignment or reclassification.

**Table 2**

| Likelihood Category | Likelihood of a Field Component Incident Selection Criteria |
|---|---|
| VERY HIGH 5 | Evaluation of the potentially-relevant factors above indicates that a Field Component Incident may occur in less than two (2) years from the date of the Risk Assessment; or<br><br>The Calculated Remaining Life of all or part of the Field Component is less than two (2) years; or<br><br>Denbury does not have all of the information that is needed to complete a Calculated Remaining Life for the Field Component; or<br><br>The Field Component has been In-use greater than ten (10) years without an API Inspection. |
| HIGH 4 | Evaluation of the potentially-relevant factors above indicates that a Field Component Incident may occur in two (2) years to less than ten (10) years of the date of the Risk Assessment; or<br><br>The Calculated Remaining Life of all or part of the Field Component is two (2) years to less than ten (10) years; or |

| | The Field Component has been In-use seven (7) years to less than ten (10) years without an API Inspection. |
|---|---|
| MODERATE 3 | Evaluation of the potentially-relevant factors above indicates that a Field Component Incident may occur in ten (10) years to less than fifteen (15) years of the date of the Risk Assessment; or <br><br> The Calculated Remaining Life of all or part of the Field Component is ten (10) years to less than fifteen (15) years; or <br><br> The Field Component has been In-use five (5) years to less than seven (7) years without an API Inspection. |
| VERY LOW 2 | Evaluation of the potentially-relevant factors above indicates that a Field Component Incident may occur in fifteen (15) years to less than twenty (20) years of the date of the Risk Assessment; or <br><br> The Calculated Remaining Life of all or part of a Field Component is fifteen (15) years to less than twenty (20) years; or <br><br> The Field Component has been In-use one (1) year to less than five (5) years without an API Inspection. |
| REMOTE 1 | Evaluation of the potentially relevant factors above indicates that a Field Component Incident may occur in twenty (20) or more years from the date of the Risk Assessment; or <br><br> The Calculated Remaining Life of all or part of the Field Component is twenty (20) or more years; or <br><br> The Field Component has been In-use less than one (1) year without an API Inspection. |

c. **Determining Criticality Rankings**

Denbury shall assign a Criticality Ranking for each Field Component in accordance with Table 3 ("Risk Assessment Matrix") by cross referencing the Consequence Category with the Likelihood Category for that Field Component. However, for any Pipeline within 660 feet of a Water Body outside of Secondary Containment, Denbury shall assign a Criticality Ranking of Significant or High, unless the Pipeline is newly installed and has been In-use for less than five (5) years. Denbury shall document the Criticality Rankings and all reclassifications of the Criticality Ranking for each Field Component in MIMS.

**Table 3**

**Risk Assessment Matrix**

| Criticality Ranking | | | | | | |
|---|---|---|---|---|---|---|
| | | Consequence Category | | | | |
| | | **1** | **2** | **3** | **4** | **5** |
| **Likelihood Category** | **5** | Medium 5 | Medium 10 | Significant 15 | High 20 | High 25 |
| | **4** | Low 4 | Medium 8 | Significant 12 | Significant 16 | High 20 |
| | **3** | Low 3 | Medium 6 | Medium 9 | Significant 12 | Significant 15 |
| | **2** | Low 2 | Low 4 | Medium 6 | Medium 8 | Medium 10 |
| | **1** | Low 1 | Low 2 | Low 3 | Low 4 | Medium 5 |
| *Criticality Ranking = Likelihood Category multiplied by the Consequence Category* | | | | | | |

## 5.    Inspections (Visual Surveillance and API Inspections)

Within sixty (60) Days after completing each baseline or subsequent Risk Assessment, Denbury shall develop and implement a schedule for Inspections for each Field to include, at a minimum, visual surveillance ("Visual Surveillance") and API inspections ("API Inspections") for each Field Component as provided in this Section.

### a.    Visual Surveillance

Denbury shall conduct Visual Surveillance of each Field Component by visually observing the Field Component to evaluate the condition of the Field Component, including at a minimum the presence of any Anomaly or Field Component Incident.

In addition, the Visual Surveillance shall include, at a minimum, the following for these specific Field Components:

- **Vessels:** visually inspect the Vessels for evidence of vibration, signs of leakage, unusual noises, insulation deterioration, relief device actuation, distorting, denting, temperature excursions, presence of rust stains from under insulation or other barriers or crevices (e.g., rust bleeding, etc.), and for any other indications of a risk of compromised integrity.

- **Tanks:** visually inspect the Tanks, Tank coatings, insulation systems, valves, and appurtenances for evidence of leaks, shell distortion, settlement, and for any other indications of a risk of compromised integrity or need for maintenance.

- **Above-ground Pipelines:** visually inspect the Pipeline (by walking, driving, or using unmanned technology) to: a) look for evidence of vibration, line movement, cover

9

erosion, liquid hammer/slugging, rust bleed, cracks, dents, corrosion, leaks, and any other indications of a risk of compromised integrity; and b) assess the condition of structural supports/anchors and external coating.

- **Below-ground Pipelines:** visually inspect the ground along the route of the Pipeline and any associated Well (by walking, driving, or using unmanned technology) to look for evidence of leaks or pipeline failures, including any oil on the ground or in a Water Body, impacts to depth of cover, and the need to clear vegetation.

- **Safety Devices:** conduct reliability testing according to the most recent edition at the time of the testing of API RP 14C (regarding testing of basic surface safety systems) to maintain the Safety Device in good condition (fit for service).

Denbury shall require that its representatives who perform Visual Surveillance record any finding of a Field Component Incident within one (1) Business Day after the date of the Visual Surveillance and record any other Anomaly or need for maintenance within the time set forth in Section III(9). Denbury shall also require that its representatives, including independent contractors or third parties, who perform Visual Surveillance, notify Denbury of any visually observed Priority 1 Anomaly within 24 hours after the representative observes the Priority 1 Anomaly.

Denbury shall conduct Visual Surveillance, at a minimum, according to the following inspection schedule for each of the categories of Field Components below:

- For all Field Components that have a Criticality Ranking of High, Denbury shall perform Visual Surveillance at least once weekly.

- For all Field Components that have a Criticality Ranking of Significant, Denbury shall perform visual surveillance at least once monthly.

- For all Field Components that have a Criticality Ranking of Medium or Low, Denbury shall perform visual surveillance at least once every six months.

- For all Safety Devices, Denbury shall perform reliability testing as the Visual Surveillance for those devices. Denbury shall perform the reliability testing at least once a year.

- Denbury shall perform Visual Surveillance of Pipelines on a daily basis to the extent required under Denbury's SPCC Plans.

Denbury may fulfill the Visual Surveillance requirements of the MI Program as part of normal routine rounds or duties, SPCC inspections, or random company audits (or any combination of the three) provided it complies with the Visual Surveillance requirements of the MI Program.

b.     **API Inspections**

Denbury shall perform API Inspections of all Field Components that have a Criticality Ranking of Significant or High.  Except as provided otherwise in this Section III(5)(b), Denbury shall

perform all non-destructive API Inspections using API certified ("API Certified") inspectors in accordance with the methods of the most recent editions of the API standards at the times of the Inspections, including but not limited to: API-510 (regarding Vessel inspection); API-570 (regarding piping inspection); and API-653 (regarding Tank inspection).

An API Certified inspector shall conduct the visual aspect of the API Inspection, collect, document and analyze inspection data, and generate a report that shall include the inspection data, results and inspector's recommendations ("API Inspection Report"). API Certified inspectors may also conduct the data collection aspects of the API Inspection or may use certified technician(s) working under their direction. Denbury shall require that each API Inspection Report is completed within sixty (60) Business Days after completion of the field information gathering part of the API Inspection. Denbury shall add all API Inspection data and API Inspection Reports to MIMS as provided in Section III(9). Denbury shall require that its API Certified inspectors notify Denbury of any visually observed Priority 1 Anomaly within 24 hours after the API Inspector observes the Priority 1 Anomaly.

> i.      **Initial API Inspection Schedules**

Denbury shall conduct an initial API Inspection of each Field Component, except for Safety Devices, according to the schedule in Appendix C to the Consent Decree, unless an API Inspection was previously conducted after January 1, 2015, or the Field Component was less than two (2) years old at the time of the baseline Risk Assessment.

> ii.      **Subsequent API Inspection Schedules for Pipelines**

Denbury shall conduct subsequent API Inspections for Pipelines at least as frequently as provided in the most recent edition at the time of the Inspection of API-570 (regarding piping inspection).

> c.      **Additional Changes to Visual Surveillance and API Inspections**

Denbury shall conduct Visual Surveillance and API Inspections more frequently than required under this Section, when required by manufacturer specifications, regulatory requirements (including SPCC requirements), or Denbury protocols. Denbury shall also conduct Visual Surveillance or API Inspections more frequently than required under this Section, based upon new information gained through a Visual Surveillance, API Inspection, other observation, or recalculation of the Calculated Remaining Life of a Field Component.

> d.      **Determining Calculated Remaining Life**

Denbury shall determine the Calculated Remaining Life for above-ground Pipelines according to reference section 7.2 of API-570 (2016) and for Tanks and Vessels according to reference section 7.2 of API-510 (2014).

**6.      <u>Anomaly Resolution</u>**

Denbury shall Resolve Anomalies in accordance with this Section of the MI Program ("Anomaly Resolution").

Anomalies must be Resolved according to the following priority levels ("Priority Levels") and timetables:

- **Priority 1.** Denbury shall classify an Anomaly as Priority 1 ("Urgent") if the Anomaly is in an unsafe, unmanageable or unpredictable condition, and the Anomaly may have immediate safety and environmental implications. Priority 1 examples shall include, but not necessarily be limited to: 1) any large breaks and ruptures or small leaks, seeps, and weeps outside of Secondary Containment; 2) any large breaks or ruptures inside of Secondary Containment; 3) Field Components that have ninety (90) Days or less of Calculated Remaining Life; and 4) anything that has fallen on a Pipeline and potentially caused damage or extra weight.  Priority 1 Anomalies require immediate notification to Denbury management. Priority 1 Anomalies shall be a high priority, and Denbury shall Resolve Priority 1 Anomalies as soon as is practicable, but in any event no later than five (5) Days after Discovery of the Anomaly; however, Denbury shall immediately Resolve (by stopping and containing the release): i) any releases from large breaks and ruptures at any location and ii) any small leaks, seeps, or weeps outside of Secondary Containment.

- **Priority 2.** Denbury shall classify an Anomaly as Priority 2 ("Action") where continued safe operation of the Field Component is predictable and manageable, but further deterioration may lead to a Field Component Incident resulting in negative safety and/or environmental implications. Priority 2 examples shall include, but not necessarily be limited to: 1) any small leaks, seeps, and weeps within Secondary Containment; 2) Field Components that have more than ninety (90) Days, and less than two (2) years of Calculated Remaining Life; 3) any cracks or dents in a pipe; and 4) any excavation, third party, or other outside force damage. Denbury shall Resolve Priority 2 Anomalies within ninety (90) Days after Discovery of the Anomaly, and shall perform interim Visual Surveillance of the Field Component to monitor its condition as Denbury deems necessary.

- **Priority 3.** Denbury shall classify an Anomaly as Priority 3 ("Caution") where, through continued deterioration, it may become a Priority 1 or 2. Priority 3 examples shall include, but not necessarily be limited to Field Components that have a Calculated Remaining Life of two (2) years to less than five (5) years. Denbury shall Resolve Priority 3 Anomalies within one hundred eighty (180) Days after Discovery of the Anomaly, and shall perform interim Visual Surveillance of the Field Component to monitor its condition as Denbury deems necessary.

- **Priority 4.** Denbury shall classify an Anomaly as Priority 4 ("Planning") if the risk of a Field Component Incident is sufficiently low as to not require actions in the timeframes of Priority 1 through 3. Priority 4 examples shall include, but not necessarily be limited to: 1) Field Components that have a Calculated Remaining Life of five (5) years to less than ten (10) years; and 2) any other conditions in Field Components and/or operations that, if not addressed, could lead to a future Field Component Incident outside of the timeframes to Resolve a Priority Level 1, 2, or 3 Anomaly. Denbury shall Resolve Priority 4 Anomalies on an as needed basis; however, Field Components with Priority 4 anomalies shall be Inspected and documented in accordance with the MI Program.

Denbury shall document and track all Anomalies in MIMS, including: the date of Discovery; a description of the Anomaly; the deadline for Denbury to Resolve it; the date it was Resolved; the actions taken to Resolve it; and the name of the person(s) who performed the work.

## 7.   Operation and Maintenance

Denbury shall implement procedures for the ongoing operation and maintenance ("Operation and Maintenance Procedures") of each Field to prevent discharges of oil to a Water Body which must include, but need not be limited to, the following:

     a.    Methods to prevent and/or mitigate internal and external wall loss in above- and below-ground Field Components, including consideration of the following: applying cathodic protection and chemical inhibitors, wrappings and coatings, and/or other measures to all Pipelines to reduce corrosion;

     b.    Methods to verify that Field Components are functioning properly and reliably; and

     c.    Measures to address all Pipelines that cross streams, including burying, raising, or taking other measures to prevent any segments within the 100-year flood plain (where 100-year flood plain data is publicly available) from being compromised by extreme currents, debris, or other threats posed by a 100-year flood.

Denbury shall maintain dated copies of its Operation and Maintenance Procedures required by this Paragraph in MIMS and shall indicate which version is in effect.

## 8.   Post Incident Analysis

Denbury shall follow the requirements of this Section, in addition to any other written procedures it may develop or have, to apply lessons learned from any discharge of oil required to be reported to the National Response Center ("NRC"), and to improve the effectiveness of the MI Program to prevent and mitigate future oil discharges (the "Post Incident Analysis").

As part of the Post Incident Analysis, Denbury shall prepare a report within thirty (30) Days of any discharge of oil that is required to be reported to the NRC pursuant to Section 311(b)(5) of the Clean Water Act, 33 U.S.C. § 1321(b)(5) ("Post Incident Analysis Report").

The Post Incident Analysis Report shall include: 1) an evaluation of the cause(s) of the failure that lead to the discharge using analytical methodologies and technical analyses, including an evaluation of the effectiveness of engineering, management, and operating practices that may have contributed to the failure; 2) an analysis of all actions needed to prevent future discharges from similar causes, including making adjustments to operation and maintenance procedures, improvements to personnel training and staffing increases, increasing risk assessment values, revising inspection schedules, and/or increasing priority levels and schedules for repair, replacement, or other removal of any other Anomalies that are the same or similar to the ones that contributed to the failure in order to prevent a similar failure from recurring elsewhere at the Field(s); 3) photographs (if any) of the failed Field Component that caused the discharge, the discharge of oil from the Field Component to the Water Body and the impact on the Water Body,

and 4) a schedule for implementing the changes consistent with the timelines set forth in the MI Program. Denbury shall implement the changes in accordance with the schedule in the Post Incident Analysis Report, but in any event, shall commence implementation no later than sixty (60) Days from completion of the Post Incident Analysis Report. Denbury shall document the schedule and completion of the changes in the MIMS.

9.    **Mechanical Integrity Management System (MIMS)**

Within thirty (30) Days after the Effective Date, Denbury shall implement a MIMS for data as part of the MI Program. The MIMS shall be comprised of one or more computerized data management systems in which Denbury shall store all information necessary to document, implement, and track each of the components of the MI Program, including, but not limited to, all Field Surveys; Field Maps; Field Registers; Risk Assessments (including Consequence and Likelihood Categories and Criticality Rankings); Inspections (including date, schedules, observations, name(s) of inspector(s), results, corrective actions identified, API Inspection Reports, and history); Anomaly Resolution (anomalies, priority levels, deadlines to Resolve the anomalies, description of work performed, and person(s) who performed the work); remaining life calculations; work orders; maintenance history; and all other new, current, and historical information in Denbury's possession.

The MIMS shall also include Denbury's Environmental Management Information System for spill incident data; Computerized Maintenance Management System ("CMMS") that is used to record, manage, and track deadlines for maintenance, repair and replacement requirements; data tables that are used to assimilate and analyze data from various sources pursuant to the MI Program; and supporting information for other reports and notices required pursuant to the MI Program such as electronic copies of the required reports and notices.

Information in the MIMS shall be searchable so that Denbury employees who implement the MI Program can easily access all information. Denbury shall update MIMS to add new or corrected information as part of the implementation of the MI Program. Any information in the MIMS older than three years may be archived periodically to preserve historic data, provided Denbury employees who implement the MI Program can promptly access archived data when needed.

Except as otherwise provided in this Appendix, Denbury shall add any information that is required to be maintained in MIMS within sixty (60) Days after the date of completion of a required element of the MI Program or, for new information, the date of Discovery of such information. Such new information includes, for example, Inspection findings and other Inspection information and other field observations, new risks identified, and any repairs, replacements, additions, or other changes to Field Components. However, new information that must be taken into account within a shorter time to meet a specific deadline of the MI Program (such as Resolving an Anomaly) shall be entered in MIMS in time to meet that deadline.

## Appendix C

### MI Program Schedule

The schedule set forth below in Table 1 applies to the initial stages of implementation ("Initial Stages") of the MI Program set forth in Appendix B.  For purposes of this Appendix,

(1) The terms used herein shall have the meaning given to them in the Consent Decree and Appendix B;

(2) The schedule is stated in terms of calendar months beginning in the first month after the month in which the Consent Decree becomes effective.  The deadline for any given calendar month shall be the last Day of that month except for MIMS, which shall be completed within 30 days after the Effective Date.

(3) Stages may commence prior to the implementation period without accelerating the completion date for that stage.

(4) The Initial Stages shall include:

(a) implementing a Mechanical Integrity Management System (MIMS);

(b) gathering data and developing the Field Surveys, Field Registers, and Field Maps;

(c) performing baseline Risk Assessments and developing Inspection plans; and

(d) conducting Inspections per the Inspection plans.

(5) Other elements of the MI Program not included in the Initial Stages, including updating Field Registries and Field Maps, performing subsequent Risk Assessments and Inspections, and completing Post Incident Analysis, shall be performed as set forth in Appendix B.

### Table 1.  Implementation Plan for Initial Stages

| Fields | Stage | Complete By |
|---|---|---|
| ALL | MIMS | Month 1* |
| | | |
| Tinsley, E. Heidelberg, W. Heidelberg | Data & Information Gathering | Month 6 |
| | Risk Assessments & Inspection Planning | Month 12 |
| | Inspections | Month 24 |
| | | |
| Eucutta, Martinville, W. Mallalieu, Soso | Data & Information Gathering | Month 18 |
| | Risk Assessments & Inspection Planning | Month 24 |
| | Inspections | Month 36 |

*\* See note 2 above*

## Table 2. Illustrated Implementation Schedule

| Stage | Fields | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | Complete By |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MIMS | ALL | MIMS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Month 1* |
| Data & Information Gathering | Tinsley, E. Heidelberg, W. Heidelberg | Data | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Month 6 |
| Risk Assessments & Inspection Planning | | | | | | | | RA & IP | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Month 12 |
| Inspections | | | | | | | | | | | | | | | Inspections | | | | | | | | | | | | | | | | | | | | | | | Month 24 |
| Data & Information Gathering | Eucutta, Martinville, Mallalieu, Soso | | | | | | | | | | | | | Data | | | | | | | | | | | | | | | | | | | | | | | | Month 18 |
| Risk Assessments & Inspection Planning | | | | | | | | | | | | | | | | | | | | RA & IP | | | | | | | | | | | | | | | | | Month 24 |
| Inspections | | | | | | | | | | | | | | | | | | | | | | | | | | Inspections | | | | | | | | | | | Month 36 |

*See note 2 above*

2

## Appendix D – List of Environmental Features

The following environmental features are to be included where they are designated or otherwise

identified on publicly available federal, state, local maps or data sources, are readily visible at the Field,

or are otherwise known to Defendant:

1. All Water Bodies
2. Protected bird nesting areas, including Federal and State endangered, threatened or otherwise listed species, migratory birds and waterfowl
3. Critical biological resource areas
4. Critical habitats for endangered or threatened species
5. Conservation areas
6. Migratory routes
7. Seasonal habitats
8. Drinking water sources
9. Natural resource management areas
10. Heritage program areas or sites
11. Historical and archaeological sites and parks
12. Public trust areas
13. Marine sanctuaries and estuarine reserves
14. National and State parks
15. National forests
16. Natural disaster area hazard rankings (earthquake, hurricane, flood, landslide)
17. Other Federal or State lands (BLM land,etc.)
18. Wildlife preserves, refuges and other Protected wildlife areas
19. Public recreational areas
20. Unique habitats such as aquaculture sites and agricultural surface water intakes
21. USGS water monitoring stations
22. Wells
23. Wetland areas, including National Wetland Inventory (NWI) Mapped wetlands and state and local mapped wetlands
24. Wild and scenic rivers
25. Wilderness and natural resource areas

Appendix E
Semi-Annual Report

**Reporting Period:** _____

Status of Mechanical Integrity Program (Appendix B) - Overall

| MI Program Element | Reporting Element | Metric(s) | Description |
|---|---|---|---|
| MIMS | Status | *Status* | Status for element |
| Personnel Training Program | Develop, electronically document, and commence to implement | *Status* | Status for element |
| Operation and Maintenance | Status | *Status* | Status for element |
| | Name of Procedures | *Procedure Names* | List of procedures implemented during reporting period |

**Status of Mechanical Integrity Program (Appendix B) - Tinsley**

| MI Program Element | Reporting Element | Metric(s) | | Description |
|---|---|---|---|---|
| Field Survey | Status | *Status* | | Status for element |
| | Field Components & Field Map Components | # | | Total # to date |
| Field Register | Status | *Status* | | Status for element |
| | Field Components | # | | Total # to date |
| Field Map | Status | *Status* | | Status for element |
| | Field Map Components | # | | Total # to date |
| Risk Assessment | Status | *Status* | | Status for element |
| | Low | # | | # of each Field Component Criticality Ranking assessed in reporting period |
| | Medium | # | | |
| | Significant | # | | |
| | High | # | | |
| | Identity of Significant or High | *Field Component Types (i.e., Pipelines, Tanks, Vessels, Safety Devices)* | | List of Field Component types assessed as Significant or High Criticality Ranking |
| Inspections | Status | *Status* | | Status for element |
| | Safety Device Testing | # | | # of Field Components inspected in reporting period |
| | Visual Surveillance | # | | |
| | API Inspections | # | | |
| Anomaly Resolution | Status | *Status* | | Status for element |
| | | *Discovered* | *Resolved** | |
| | Priority 1 | # | # | # Field Components in reporting period |
| | Priority 2 | # | # | |
| | Priority 3 | # | # | |
| | Priority 4 | # | # | |
| Training | | *Required* | *Completed** | |
| | Initial Training | # | # | Total personnel trained during initial 120 days |
| | New Employees | # | # | # of new personnel trained in reporting period |
| | New Responsibilities | # | # | # trained in reporting period due to new responsibilities |
| | Annual Refresher | # | # | # trained in reporting period for annual refresher |

*\* Anomaly Resolution Discovered/Resolved and Training Required/Completed columns are not intended to be reconciled due to timing*

Status of Mechanical Integrity Program (Appendix B) - East Heidelberg

| MI Program Element | Reporting Element | Metric(s) | | Description |
|---|---|---|---|---|
| Field Survey | Status | *Status* | | Status for element |
| | Field Components & Field Map Components | # | | Total # to date |
| Field Register | Status | *Status* | | Status for element |
| | Field Components | # | | Total # to date |
| Field Map | Status | *Status* | | Status for element |
| | Field Map Components | # | | Total # to date |
| Risk Assessment | Status | *Status* | | Status for element |
| | Low | # | | # of each Field Component Criticality Ranking assessed in reporting period |
| | Medium | # | | |
| | Significant | # | | |
| | High | # | | |
| | Identity of Significant or High | *Field Component Types (i.e., Pipelines, Tanks, Vessels, Safety Devices)* | | List of Field Component types assessed as Significant or High Criticality Ranking |
| Inspections | Status | *Status* | | Status for element |
| | Safety Device Testing | # | | # of Field Components inspected in reporting period |
| | Visual Surveillance | # | | |
| | API Inspections | # | | |
| Anomaly Resolution | Status | *Status* | | Status for element |
| | | *Discovered* | *Resolved** | |
| | Priority 1 | # | # | # Field Components in reporting period |
| | Priority 2 | # | # | |
| | Priority 3 | # | # | |
| | Priority 4 | # | # | |
| Training | | *Required* | *Completed** | |
| | Initial Training | # | # | Total personnel trained during initial 120 days |
| | New Employees | # | # | # of new personnel trained in reporting period |
| | New Responsibilities | # | # | # trained in reporting period due to new responsibilities |
| | Annual Refresher | # | # | # trained in reporting period for annual refresher |

*Anomaly Resolution Discovered/Resolved and Training Required/Completed columns are not intended to be reconciled due to timing*

Status of Mechanical Integrity Program (Appendix B) - West Heidelberg

| MI Program Element | Reporting Element | Metric(s) | | Description |
|---|---|---|---|---|
| Field Survey | Status | *Status* | | Status for element |
| | Field Components & Field Map Components | # | | Total # to date |
| Field Register | Status | *Status* | | Status for element |
| | Field Components | # | | Total # to date |
| Field Map | Status | *Status* | | Status for element |
| | Field Map Components | # | | Total # to date |
| Risk Assessment | Status | *Status* | | Status for element |
| | Low | # | | # of each Field Component Criticality Ranking assessed in reporting period |
| | Medium | # | | |
| | Significant | # | | |
| | High | # | | |
| | Identity of Significant or High | *Field Component Types (i.e., Pipelines, Tanks, Vessels, Safety Devices)* | | List of Field Component types assessed as Significant or High Criticality Ranking |
| Inspections | Status | *Status* | | Status for element |
| | Safety Device Testing | # | | # of Field Components inspected in reporting period |
| | Visual Surveillance | # | | |
| | API Inspections | # | | |
| Anomaly Resolution | Status | *Status* | | Status for element |
| | | *Discovered* | *Resolved\** | |
| | Priority 1 | # | # | # Field Components in reporting period |
| | Priority 2 | # | # | |
| | Priority 3 | # | # | |
| | Priority 4 | # | # | |
| Training | | *Required* | *Completed\** | |
| | Initial Training | # | # | Total personnel trained during initial 120 days |
| | New Employees | # | # | # of new personnel trained in reporting period |
| | New Responsibilities | # | # | # trained in reporting period due to new responsibilities |
| | Annual Refresher | # | # | # trained in reporting period for annual refresher |

*\* Anomaly Resolution Discovered/Resolved and Training Required/Completed columns are not intended to be reconciled due to timing*

Status of Mechanical Integrity Program (Appendix B) - East Eucutta

| MI Program Element | Reporting Element | Metric(s) | | Description |
|---|---|---|---|---|
| Field Survey | Status | Status | | Status for element |
| | Field Components & Field Map Components | # | | Total # to date |
| Field Register | Status | Status | | Status for element |
| | Field Components | # | | Total # to date |
| Field Map | Status | Status | | Status for element |
| | Field Map Components | # | | Total # to date |
| Risk Assessment | Status | Status | | Status for element |
| | Low | # | | # of each Field Component Criticality Ranking assessed in reporting period |
| | Medium | # | | |
| | Significant | # | | |
| | High | # | | |
| | Identity of Significant or High | Field Component Types (i.e., Pipelines, Tanks, Vessels, Safety Devices) | | List of Field Component types assessed as Significant or High Criticality Ranking |
| Inspections | Status | Status | | Status for element |
| | Safety Device Testing | # | | # of Field Components inspected in reporting period |
| | Visual Surveillance | # | | |
| | API Inspections | # | | |
| Anomaly Resolution | Status | Status | | Status for element |
| | | Discovered | Resolved* | |
| | Priority 1 | # | # | # Field Components in reporting period |
| | Priority 2 | # | # | |
| | Priority 3 | # | # | |
| | Priority 4 | # | # | |
| Training | | Required | Completed* | |
| | Initial Training | # | # | Total personnel trained during initial 120 days |
| | New Employees | # | # | # of new personnel trained in reporting period |
| | New Responsibilities | # | # | # trained in reporting period due to new responsibilities |
| | Annual Refresher | # | # | # trained in reporting period for annual refresher |

* Anomaly Resolution Discovered/Resolved and Training Required/Completed columns are not intended to be reconciled due to timing

Status of Mechanical Integrity Program (Appendix B) - West Mallalieu

| MI Program Element | Reporting Element | Metric(s) | | Description |
|---|---|---|---|---|
| Field Survey | Status | *Status* | | Status for element |
| | Field Components & Field Map Components | # | | Total # to date |
| Field Register | Status | *Status* | | Status for element |
| | Field Components | # | | Total # to date |
| Field Map | Status | *Status* | | Status for element |
| | Field Map Components | # | | Total # to date |
| Risk Assessment | Status | *Status* | | Status for element |
| | Low | # | | # of each Field Component Criticality Ranking assessed in reporting period |
| | Medium | # | | |
| | Significant | # | | |
| | High | # | | |
| | Identity of Significant or High | *Field Component Types (i.e., Pipelines, Tanks, Vessels, Safety Devices)* | | List of Field Component types assessed as Significant or High Criticality Ranking |
| Inspections | Status | *Status* | | Status for element |
| | Safety Device Testing | # | | # of Field Components inspected in reporting period |
| | Visual Surveillance | # | | |
| | API Inspections | # | | |
| Anomaly Resolution | Status | *Status* | | Status for element |
| | | *Discovered* | *Resolved** | |
| | Priority 1 | # | # | # Field Components in reporting period |
| | Priority 2 | # | # | |
| | Priority 3 | # | # | |
| | Priority 4 | # | # | |
| Training | | *Required* | *Completed** | |
| | Initial Training | # | # | Total personnel trained during initial 120 days |
| | New Employees | # | # | # of new personnel trained in reporting period |
| | New Responsibilities | # | # | # trained in reporting period due to new responsibilities |
| | Annual Refresher | # | # | # trained in reporting period for annual refresher |

*\* Anomaly Resolution Discovered/Resolved and Training Required/Completed columns are not intended to be reconciled due to timing*

Status of Mechanical Integrity Program (Appendix B) - Martinville

| MI Program Element | Reporting Element | Metric(s) | | Description |
|---|---|---|---|---|
| Field Survey | Status | *Status* | | Status for element |
| | Field Components & Field Map Components | # | | Total # to date |
| Field Register | Status | *Status* | | Status for element |
| | Field Components | # | | Total # to date |
| Field Map | Status | *Status* | | Status for element |
| | Field Map Components | # | | Total # to date |
| Risk Assessment | Status | *Status* | | Status for element |
| | Low | # | | # of each Field Component Criticality Ranking assessed in reporting period |
| | Medium | # | | |
| | Significant | # | | |
| | High | # | | |
| | Identity of Significant or High | *Field Component Types (i.e., Pipelines, Tanks, Vessels, Safety Devices)* | | List of Field Component types assessed as Significant or High Criticality Ranking |
| Inspections | Status | *Status* | | Status for element |
| | Safety Device Testing | # | | # of Field Components inspected in reporting period |
| | Visual Surveillance | # | | |
| | API Inspections | # | | |
| Anomaly Resolution | Status | *Status* | | Status for element |
| | | *Discovered* | *Resolved** | |
| | Priority 1 | # | # | # Field Components in reporting period |
| | Priority 2 | # | # | |
| | Priority 3 | # | # | |
| | Priority 4 | # | # | |
| Training | | *Required* | *Completed** | |
| | Initial Training | # | # | Total personnel trained during initial 120 days |
| | New Employees | # | # | # of new personnel trained in reporting period |
| | New Responsibilities | # | # | # trained in reporting period due to new responsibilities |
| | Annual Refresher | # | # | # trained in reporting period for annual refresher |

* Anomaly Resolution Discovered/Resolved and Training Required/Completed columns are not intended to be reconciled due to timing

Status of Mechanical Integrity Program (Appendix B) - Soso

| MI Program Element | Reporting Element | Metric(s) | | Description |
|---|---|---|---|---|
| Field Survey | Status | *Status* | | Status for element |
| | Field Components & Field Map Components | # | | Total # to date |
| Field Register | Status | *Status* | | Status for element |
| | Field Components | # | | Total # to date |
| Field Map | Status | *Status* | | Status for element |
| | Field Map Components | # | | Total # to date |
| Risk Assessment | Status | *Status* | | Status for element |
| | Low | # | | # of each Field Component Criticality Ranking assessed in reporting period |
| | Medium | # | | |
| | Significant | # | | |
| | High | # | | |
| | Identity of Significant or High | *Field Component Types (i.e., Pipelines, Tanks, Vessels, Safety Devices)* | | List of Field Component types assessed as Significant or High Criticality Ranking |
| Inspections | Status | *Status* | | Status for element |
| | Safety Device Testing | # | | # of Field Components inspected in reporting period |
| | Visual Surveillance | # | | |
| | API Inspections | # | | |
| Anomaly Resolution | Status | *Status* | | Status for element |
| | | *Discovered* | *Resolved** | |
| | Priority 1 | # | # | # Field Components in reporting period |
| | Priority 2 | # | # | |
| | Priority 3 | # | # | |
| | Priority 4 | # | # | |
| Training | | *Required* | *Completed** | |
| | Initial Training | # | # | Total personnel trained during initial 120 days |
| | New Employees | # | # | # of new personnel trained in reporting period |
| | New Responsibilities | # | # | # trained in reporting period due to new responsibilities |
| | Annual Refresher | # | # | # trained in reporting period for annual refresher |

* Anomaly Resolution Discovered/Resolved and Training Required/Completed columns are not intended to be reconciled due to timing

**Notes on Compliance with Oil Pollution Prevention Regulations  (Section VI(E))**

**Notes on Designation of Defendant's Environmental Officials (Section VI(B))**

**Summary of NRC Reportable Discharges (Section VI(C))**

| NRC # | Field | Spill Date | NRC Notification Date | EPA Report Date | Post Incident Analysis Report # | Post Incident Analysis Report Date |
|-------|-------|-----------|----------------------|-----------------|-------------------------------|-----------------------------------|
|       |       |           |                      |                 |                               |                                   |
|       |       |           |                      |                 |                               |                                   |
|       |       |           |                      |                 |                               |                                   |
|       |       |           |                      |                 |                               |                                   |
|       |       |           |                      |                 |                               |                                   |

**Information Reported to Regional Administrator [as required by 40 C.F.R. § 112.4(a)] (Section VI(C))**

**Report of Noncompliance (Section VI(A))**

| Field | Area of Noncompliance | Circumstances Leading to Noncompliance | Schedule to Correct Noncompliance |
|-------|----------------------|----------------------------------------|-----------------------------------|
|       |                      |                                        |                                   |
|       |                      |                                        |                                   |
|       |                      |                                        |                                   |
|       |                      |                                        |                                   |
|       |                      |                                        |                                   |

**Notes for Further Explanation or Clarification**